# In the United States Court of Federal Claims
## OFFICE OF SPECIAL MASTERS
### No. 21-1185V

|  |  |
|---|---|
| MIRANDA CHU,<br><br>                    Petitioner,<br>v.<br><br>SECRETARY OF HEALTH AND<br>HUMAN SERVICES,<br><br>                    Respondent. | Chief Special Master Corcoran<br><br>Filed: July 18, 2025 |

*Jason L. Jorgenson*, Philbrook Law, Vancouver, WA, for Petitioner.

*Adam Nemeth Muffett*, U.S. Department of Justice, Washington, DC, for Respondent.

### **ENTITLEMENT DECISION**[1]

On April 12, 2021, Miranda Chu filed a Petition for compensation under the National Vaccine Injury Compensation Program, 42 U.S.C. §300aa-10, *et seq.*[2] (the "Vaccine Act"), alleging that she suffered a shoulder injury related to vaccine administration ("SIRVA"), a Vaccine Injury Table ("the Table") claim, *see* 42 C.F.R. §§ 100.3(a), (c)(10), following her receipt of a tetanus-diphtheria-acellular pertussis ("Tdap") vaccine on July 21, 2015. Petition, ECF No. 1 at Preamble and ¶ 3. The case was assigned to the Office of Special Masters ("OSM")'s Special Processing Unit ("SPU").

---

[1] Because this unpublished decision contains a reasoned explanation for the action in this case, I am required to post it on the United States Court of Federal Claims' website in accordance with the E-Government Act of 2002. 44 U.S.C. § 3501 note (2012) (Federal Management and Promotion of Electronic Government Services). **This means the decision will be available to anyone with access to the internet.** In accordance with Vaccine Rule 18(b), petitioner has 14 days to identify and move to redact medical or other information, the disclosure of which would constitute an unwarranted invasion of privacy. If, upon review, I agree that the identified material fits within this definition, I will redact such material from public access.

[2] National Childhood Vaccine Injury Act of 1986, Pub. L. No. 99-660, 100 Stat. 3755. Hereinafter, for ease of citation, all section references to the Vaccine Act will be to the pertinent subparagraph of 42 U.S.C. § 300aa (2012).

Petitioner has not preponderantly established a Table SIRVA – specifically the requirements of an injury limited to the shoulder, and elimination of the potential alternative explanation of a pre-existing vascular malformation within the shoulder. And any remaining "off-Table" causation-in-fact claim would be barred by the Act's statute of limitations. Accordingly, entitlement cannot be found for Petitioner, and the claim must be dismissed in its entirety.

## I. Procedural History

As noted above, Petitioner received a Tdap vaccine on July 21, 2015, and the first medical records of a post-vaccination injury are from just nine days later. The Vaccine Program statute of limitations runs 36 months from the onset of the alleged injury. Section 16(a)(2). Thus, Petitioner's deadline to file a Vaccine Program claim was in late July 2018 – and this claim was not filed by that time.

Rather, Petitioner's first legal action was a state court claim against her primary care practice (which had administered the vaccine). That claim was filed on January 20, 2019, and dismissed for improper venue on June 26, 2020. She then filed this Vaccine Program claim in April 2021, alleging timeliness based on the "lookback" period for Table SIRVA claims. ECF Nos. 1, 15. (Respondent later agreed that the Table SIRVA claim was timely filed under the lookback provision, ECF No. 48 at n. 1.)

In September 2022, Petitioner's claim was assigned to SPU – OSM's procedure for expediting the processing of claims that have previously been resolved without need for extensive litigation or expert input. ECF No. 22. Petitioner filed additional exhibits, and the parties engaged in litigative risk settlement discussions but reached an impasse in May 2024. *See generally* ECF Nos. 22 – 46. Accordingly, Respondent filed his Rule 4(c) Report opposing compensation. Rule 4(c) Report, ECF No. 48. The parties were ordered to file briefs and any additional evidence they wished to have considered (or alternatively, to request suspension of the briefing schedule, in the event that they wished to revisit settlement discussions). ECF No. 49; Petitioner's Ex. 26 and Brief filed Jan. 8, 2025, ECF No. 42; Response filed Mar. 10, 2025, ECF No. 53. Petitioner did not avail herself of the opportunity to file a Reply. The matter is now ripe for adjudication.

## II. Authority

Before compensation can be awarded under the Vaccine Act, a petitioner must demonstrate, by a preponderance of evidence, all matters required under Section 11(c)(1), including the factual circumstances surrounding his or her claim. Section 13(a)(1)(A). In making such determinations, the special master or court should consider

the record as a whole. Section 13(a)(1). Petitioner's allegations must be supported by medical records or by medical opinion. *Id.*

To resolve factual issues, the special master must weigh the evidence presented, which may include contemporaneous medical records and testimony. *See Burns v. Sec'y of Health & Hum. Servs.,* 3 F.3d 415, 417 (Fed. Cir. 1993) (explaining that a special master must decide what weight to give evidence including oral testimony and contemporaneous medical records). Contemporaneous medical records are presumed to be accurate. *See Cucuras v. Sec'y of Health & Hum. Servs.*, 993 F.2d 1525, 1528 (Fed. Cir. 1993). To overcome the presumptive accuracy of medical records testimony, a petitioner may present testimony which is "consistent, clear, cogent, and compelling." *Sanchez v. Sec'y of Health & Hum. Servs.,* No. 11–685V, 2013 WL 1880825, at *3 (Fed. Cl. Spec. Mstr. Apr. 10, 2013) (citing *Blutstein v. Sec'y of Health & Hum. Servs.,* No. 90–2808V, 1998 WL 408611, at *5 (Fed. Cl. Spec. Mstr. June 30, 1998)).

In addition to requirements concerning the vaccination received, the duration and severity of petitioner's injury, and the lack of other award or settlement,[3] a petitioner must establish that she suffered an injury meeting the Table criteria, in which case causation is presumed, or an injury shown to be caused-in-fact by the vaccination she received. Section 11(c)(1)(C).

The effective version of the Table, which can be found at 42 C.F.R. § 100.3, identifies the vaccines covered under the Program, the corresponding injuries, and the time period in which the particular injuries must occur after vaccination. Section 14(a). Pursuant to the Vaccine Injury Table, a SIRVA is compensable if it manifests within 48 hours of the administration of a covered vaccine. 42 C.F.R. § 100.3(a). The criteria establishing a SIRVA under the accompanying QAI are as follows:

> *Shoulder injury related to vaccine administration (SIRVA).* SIRVA manifests as shoulder pain and limited range of motion occurring after the administration of a vaccine intended for intramuscular administration in the upper arm. These symptoms are thought to occur as a result of unintended injection of vaccine antigen or trauma from the needle into and around the underlying bursa of the shoulder resulting in an inflammatory reaction. SIRVA is caused by an injury to the musculoskeletal structures of the

---

[3] In summary, a petitioner must establish that he or she received a vaccine covered by the Program, administered either in the United States and its territories or in another geographical area but qualifying for a limited exception; suffered the residual effects of the injury for more than six months, died from the injury, or underwent a surgical intervention during an inpatient hospitalization; and has not filed a civil suit or collected an award or settlement for the injury. *See* Section 11(c)(1)(A)(B)(D)(E).

shoulder (e.g. tendons, ligaments, bursae, etc.). SIRVA is not a neurological injury and abnormalities on neurological examination or nerve conduction studies (NCS) and/or electromyographic (EMG) studies would not support SIRVA as a diagnosis (even if the condition causing the neurological abnormality is not known). A vaccine recipient shall be considered to have suffered SIRVA if such recipient manifests all of the following:

(i) No history of pain, inflammation or dysfunction of the affected shoulder prior to intramuscular vaccine administration that would explain the alleged signs, symptoms, examination findings, and/or diagnostic studies occurring after vaccine injection;

(ii) Pain occurs within the specified time frame;

(iii) Pain and reduced range of motion are limited to the shoulder in which the intramuscular vaccine was administered; and

(iv) No other condition or abnormality is present that would explain the patient's symptoms (e.g., NCS/EMG or clinical evidence of radiculopathy, brachial neuritis, mononeuropathies, or any other neuropathy).

42 C.F.R. § 100.3(c)(10). *See also* Section 16(b), National Vaccine Injury Compensation Program: Revisions to the Vaccine Injury Table – Final Rule, 82 Fed. Reg. 6294-01 (Jan. 19, 2017) (noting that SIRVA would be added to the Table as of Feb. 21, 2017), *but see* 82 Fed. Reg. 11321 (Feb. 22, 2017) (delaying the effective date to Mar. 21, 2017).

I am resolving Petitioner's claim on the filed record. The Vaccine Act and Rules not only contemplate but encourage special masters to decide petitioners on the papers where (in the exercise of their discretion) they conclude that doing so will properly and fairly resolve the case. Section 12(d)(2)(D); Vaccine Rule 8(d). The decision to rule on the record in lieu of hearing has been affirmed on appeal. *Kreizenbeck v. Sec'y of Health & Hum. Servs.*, 945 F.3d 1362, 1366 (Fed. Cir. 202); *see also Hooker v. Sec'y of Health & Hum. Servs.*, 38 Fed. Cl. 397, 402 – 03 (1997) (determining that special master acted within his discretion in denying evidentiary hearing); *Burns*, 3 F.3d at 417; *Murphy v. Sec'y of Health & Hum. Servs.*, No. 90-0882V, 1991 WL 71500, at *2 (Fed. Cl. Spec. Mstr. Apr. 19, 1991).

### III. Evidence

#### A. Vaccination and Initial, Inconclusive Treatment

Upon receiving the at-issue Tdap vaccine on July 21, 2015, Petitioner was nineteen (19) years old, with no documented history of left shoulder pain or dysfunction. *See generally* Ex. 4; Ex. 5 at 3-14.[4] The vaccine was administered in her left arm during a primary care encounter. Ex. 3 at 8, 14; *see also* Ex. 13 at 1; Ex. 14 at 1.

Nine days post-vaccination, on July 30, 2015, Petitioner returned to her primary care practice for "evaluat[ion] of left shoulder, arm pain, and numbness that started after the Tdap administered here 7/21/15… decreased ROM in left shoulder and elbow. Pain in left shoulder and upper arm and numbness/tingling down her arm to 4, 5th digits of left hand 'feels like [her] funny bone.'" Ex. 5 at 15. A physical examination found tenderness and reduced range of motion ("ROM") at Petitioner's shoulder as well as the elbow, and a positive Tinel sign at the elbow.[5] *Id.* at 17. A primary care physician's assistant ("PA") tentatively assessed left shoulder pain potentially representing joint capsule or rotator cuff irritation plus an ulnar nerve injury – which both may have been caused by the vaccine according to the PA. *Id.* Petitioner was told to rest the shoulder and elbow, take ibuprofen, perform home exercises, and pursue formal physical therapy ("PT"). Ex. 5 at 17; *see also id.* at 24-27 (August 12, 2015 PT initial evaluation at the primary care practice).

Despite formal PT and chiropractic/massage treatments over the next four months, Petitioner continued to experience pain in her left shoulder, which at times radiated to the neck and down the left arm, with associated numbness and tingling plus weakness at the shoulder blade. A physical therapist endorsed a possible connection to the vaccine, but was specifically concerned for a *nerve* injury. *See generally* Ex. 5 at 44-56, 96-104, 258-60.

Petitioner's initial orthopedic and PT evaluations were at an independent clinic. On October 2, 2015, the first MRI of her left shoulder visualized a possible cyst near the glenohumeral joint and subscapularis muscle – but no evidence of other musculoskeletal pathology such as tearing or dislocation. Ex. 5 at 37-38. In November 2015, a diagnostic ultrasound did not locate any fluid accumulation; the suspected cyst was "too deep to

---

[4] In the Rule 4(c) Report at n. 2, Respondent again requested that Petitioner file a complete and *certified* copy of any medical treatment records from the three years prior to vaccination, including pediatrician records. Petitioner did not file any additional pre-vaccination records.

[5] A Tinel sign is defined as a "tingling sensation in the distal end of a limb when percussion is made at the site of a divided nerve." Dorland's Med. Dictionary Online (hereinafter "Dorland's"), *Tinel Sign*, https://www.dorlandsonline.com/dorland/definition?id=106510 (last accessed July 15, 2025).

visualize or aspirate." Ex. 5 at 74. Electrodiagnostic studies of the left shoulder found no abnormalities. *Id.* at 83. A subacromial/ subdeltoid steroid injection was administered, without relief. *Id.* at 80. Two different orthopedists expressed concern about the suspected cyst, and did not diagnose any other shoulder injury. Ex. 5 at 40, 43, 107, 115.

On January 8, 2016, a second MRI of Petitioner's left shoulder confirmed that the possible ganglion cyst remained large. Ex. 5 at 111. Afterwards on February 22, 2016, Petitioner underwent a left shoulder arthroscopy, debridement, and decompression of the cyst. *Id.* at 129. During this surgery, her biceps tendon, rotator cuff, and labrum were observed to be intact. *Id.* That surgical intervention did not relieve her injury, however. *See generally* Ex. 5 at 133-81, 282-335 (containing post-operative orthopedics and PT appointments), *id.* at 369 (third MRI of the left shoulder with similar findings, on November 17, 2016).

### B. Identification and Treatment of Vascular Malformation, at Kaiser Permanente ("Kaiser") and Oregon Health & Science University ("OHSU")

In 2016, Petitioner enrolled with the Kaiser health insurance plan and managed care consortium. Ex. 5 at 168-69, 278. On December 22, 2016, a Kaiser orthopedic oncology specialist conducted an initial evaluation of Petitioner's chronic left shoulder pain. Ex. 5 at 336. The orthopedist opined that the suspected cyst in the subscapularis area "would be difficult to access from an arthroscopic-type procedure." *Id.* at 338. And the orthopedist, conferring with sports medicine specialists, began to suspect an unrecognized labral tear, observing the absence to date of more specialized *arthrogram* MRIs. *Id.* at 338-40.

MRI arthrograms with and without contrast performed on January 5, and again on March 3, 2017, ruled out any tearing – but revealed that the previously-suspected cyst was more likely a vascular malformation. Ex. 5 at 371-73. The March 2017 MRI arthrogram report notes this vascular malformation had not "change[d] in size over the last 16 months." *Id.* at 373. The Kaiser orthopedist and his sports medicine colleagues believed that this malformation might explain Petitioner's pain, and it was not addressed during her prior surgery. *Id.* at 343-44.

At a March 29, 2017 follow-up, the Kaiser orthopedist recorded that Petitioner "continue[d] to have pain about the [left] shoulder girdle particularly with activities… occasional episodes of pain radiating down the arm as well as paresthesias along the

6

ulnar border of the forearm and into the 3rd, 4th, and 5th fingers." Ex. 5 at 347. [6] The orthopedist tentatively diagnosed a vascular malformation, which could be confirmed via an ultrasound and needle biopsy. *Id.* at 348. If confirmed, the vascular malformation's treatment options would be "observation, attempted surgical excision, and biopsy with possible sclerotherapy[7] injections" but that any intervention carried a "possibility of recurrence." *Id.* Afterwards, Kaiser radiologists advised that such treatment would be best performed at OHSU. *Id.* at 349. While awaiting that referral, Petitioner informed her Kaiser orthopedist that she was experiencing numbness "throughout [her] whole shoulder, arm, and hand." *Id.* at 352.

On August 8, 2017, Petitioner established care at OHSU's Dermatology and Vascular Anomaly Clinic. Ex. 5 at 731. Petitioner again reported that her 2015 Tdap vaccination had caused her left shoulder pain and reduced ROM beginning that same day. *Id.* she noted current "daily discomfort with aching; activity will make it worse… her fingers will have tingling and cramping as well as 'shock-like' feelings. Sometimes her shoulder will feel very hot and tight. She does get pain near her shoulder blade as well." *Id.* A physician and resident reviewed the findings from Petitioner's original MRI from October 2015, as well as a physical examination and an ultrasound performed that day by an OHSU interventional radiologist. *Id.* at 732. The vascular anomaly specialists assessed:

> This is a 21 y.o. female with a vascular malformation of the left shoulder which is causing significant morbidity with daily pain and interference of daily activities, consistent with vascular malformation.
>
> **Discussed natural history of these congenital vascular malformations which are comprised of dilated, tortuous, dilated veins. Though they are technically congenital, they may not become manifest for weeks to months or even years as the constituent veins slowly dilate over time, and can become symptomatic as they do so.** Proportional growth is expected during childhood. Hormonal shifts such as puberty, pregnancy, and OCPs [oral contraceptive pills] can also be anticipated to cause some enlargement of the lesion. Ideally, she should continue to avoid estrogen-containing OCPs as possible. Reviewed that turbulent blood flow through

---

[6] Similarly upon resuming massage/ chiropractic treatment in February 2017, Petitioner reported "P [pain] in her L [left] shoulder still causing nerve P [pain] down arm and up neck. Had surgery to clean out joint 1 year ago but didn't fix problem…" Ex. 5 at 260. She saw this provider regularly up to and including October 2017. *Id.* at 260 – 62.

[7] As explained in Respondent's Rule 4(c) Report at n. 7 and 9, the references to "sclerotherapy injections" appear to be similar or synonymous with embolization (which Petitioner underwent on July 2, and October 1, 2018).

7

> these dilated vessels can lead to localized intravascular coagulopathy (LIC) and lead to small blood clots within the lesion. These clots generally are unable to escape from the lesion, and calcify over time. They are then referred to as 'phleboliths.' Those can be painful. **Interventional treatment options sometimes include sclerotherapy and/or surgical excision. There is often a high risk of recurrence after these procedures. This location in Miranda is – unfortunately – not amenable to surgical intervention.**

Ex. 5 at 732 (emphasis added). The vascular anomaly specialists referred Petitioner for an additional neurology evaluation, and to the OHSU interventional radiologist to further discuss treatment options. *Id.*

On November 17, 2017 at Kaiser, Petitioner reported "shooting pain & tingling down the [left] arm, mostly on the medial aspect into digits 4 & 5" and neck pain. Ex. 5 at 404. A physiatrist's physical examination found reduced sensation in the pinkie, medial forearm, and lateral upper arm. *Id.* But electrodiagnostic studies were unremarkable with no evidence of carpal tunnel syndrome, ulnar neuropathy, cubital tunnel syndrome, brachial plexopathy, or cervical radiculopathy. *Id.* Accordingly, the OHSU vascular anomaly team recommended that Petitioner follow up with the OHSU interventional radiologist for possible sclerotherapy. Ex. 5 at 732; Ex. 26 at 389-90.

At a January 9, 2018 appointment, the OHSU interventional radiologist[8] reviewed Petitioner's history and past evaluations. Ex. 5 at 748-50. He observed (based on the past MRIs) that the left shoulder malformation's size had remained "essentially identical" over the past two years, and it contained phleboliths. *Id.* at 751-72. "It [the malformation] did not appear to involve the neurovascular structures by imaging but is associated with local pain, decreased ROM, and tingling in the fingers. It is deeply located in the subcoracoid soft tissues, and laterally abuts the coracoid process. There is no apparent joint involvement. Percutaneous access to the lesion will be challenging due to the location deep to the scapula and difficulty with US [ultrasound] visualization. Will likely require fluoroguidance with bony landmarks." *Id.* at 752. The radiologist discussed these malformations' nature and expected natural history, requested a PT evaluation in light of the malformation's proximity to the supra- and subscapular nerves, and prescribed gabapentin for pain. *Id.*

---

[8] As already noted, the OHSU interventional radiologist conducted an ultrasound during Petitioner's first appointment at the vascular anomaly clinic on August 8, 2017. Ex. 5 at 732. Thus, his January 9, 2018 appointment cannot necessarily be characterized as an initial evaluation.

8

At a February 6, 2018, the OHSU interventional radiologist recorded that Petitioner's recent PT evaluation (Ex. 5 at 759-62) had been "very encouraging in terms of ROM and potential to improve symptoms," but gabapentin had not relieved her pain. Ex. 5 at 763. He recommended continued conservative therapy – because "treatment options (surgery, cryoablation, embolization) each carry some risk (esp. nerve damage) and may not cure the lesion." *Id.*

On April 10, 2018, the OHSU interventional radiologist recorded that Petitioner had stopped taking gabapentin due to side effects, was pursuing acupuncture, but was "find[ing] that the pain is now dominating her life and adversely effecting her activities," and thus wanted further intervention. Ex. 26 at 372. But vascular malformation treatments generally carried risk and were "not curative but performed to control symptoms." *Id.* at 373. Petitioner's specific lesion was "particularly challenging in that it is not visible on US [ultrasound]" and the "risk of vascular or nerve injury is therefore higher." *Id.* Petitioner and her mother elected to proceed with embolization procedure. Ex. 26 at 374; *see also* Ex. 5 at 443 (April 28, 2018 resumption of PT); *id.* at 876 (May 1, 2018 acupuncture treatment start).

On July 2, 2018, the OHSU interventional radiologist performed the first embolization of Petitioner's vascular malformation in the left shoulder. Ex. 26 at 307-08. She reported some improvement in symptoms. *See e.g.,* Ex. 5 at 473, 558. But on August 7, 2018, Petitioner still had pain and hand weakness; the radiologist discussed that the first embolization had been "very limited," and they would consider repeating the procedure with a different, "posterior clavicular approach." Ex. 26 at 237.

Over the next month (mid-August to mid-September 2018) another MRI of Petitioner's left shoulder (the sixth since her injury's onset), a repeat neurological evaluation, and repeat electrodiagnostic studies yielded no new findings. Ex. 5 at 542, 510-13, 518 (organized chronologically).

On October 1, 2018, the OHSU interventional radiologist performed the second embolization. Ex. 26 at 147-48. But three weeks later, Petitioner's pain was only "minimally better," and she was "frustrated with [the] lack of response." Ex. 5 at 712. She was "reassured… that this process may take 4 – 6 months," and told to continue PT. *Id.*

In January 2019, the OHSU interventional radiologist recorded that he was not willing to offer Petitioner another embolization due to the risks. Ex. 5 at 714. He suggested for the first time that Petitioner's vascular malformation did not explain her ongoing pain – upon asking Kaiser to authorize another MRI with contrast, and an orthopedics evaluation to check for "potential adhesive capsulitis or other pathology that would more

9

directly explain [Petitioner's] pain and limited ROM." *Id.*; *see also* Ex. 5 at 588 (January 2019 PT discharge for lack of progress).

On February 5, 2019, a *seventh* MRI of Petitioner's left shoulder visualized only the vascular malformation – with negative findings in all joints and tendons. Ex. 5 at 600. Five days later, the Kaiser orthopedist reevaluated Petitioner and found only "slight" restricted ROM of the shoulder on exam. *Id.* at 597. The orthopedist maintained the assessment of a vascular malformation, which he characterized as a "lifelong issue that will cause discomfort" and not amenable to surgical excision or further embolization. Ex. 5 at 597; *see also id.* at 614, 637-38, 665, 669, 682 (orthopedist's communication with Petitioner up to July 2019).

Afterwards in spring 2019, Petitioner requested an evaluation for potential chronic regional pain syndrome ("CRPS"). Ex. 5 at 622, 631; *see also id.* at 814 (Petitioner's communication with interventional radiologist).[9]

On June 3, 2019, a Kaiser physiatrist[10] evaluated Petitioner's "left shoulder and arm pain" to "rule out CRPS." Ex. 5 at 652. This physiatrist recorded that Petitioner had two separate, numbered complaints: 1) left shoulder pain started immediately after a vaccination four years earlier, and 2) a "left C8 pattern of symptoms [which] started within a day" thereafter. *Id.* The physiatrist noted the finding, and unsuccessful treatment, of Petitioner's AVM anterior to the glenohumeral joint. *Id.* He noted that the "recent shoulder MRI was negative for glenohumeral joint/ labral pathology." *Id.* He recorded exam findings of adhesive capsulitis at the shoulder, and sensory changes and allodynia[11] in the left arm and shoulder girdle. *Id.* The physiatrist assessed that Petitioner did *not* have CRPS, but she had "two separate pain generators": 1) a shoulder injury related to vaccine administration (SIRVA), and 2) a thoracic outlet syndrome/C8 pattern of symptoms potentially related to the AVM. *Id.* The physiatrist offered a glenohumeral joint steroid injection, prescribed desipramine, and requested the OHSU interventional radiologist's opinion as to whether the AVM was compressing nerves within the brachial plexus. Ex. 5 at 653; *see also id.* at 655, 667-70, 678-79, 685-86 (subsequent steroid injection, and subsequent communication).

---

[9] Certain medical records reflect Petitioner's report of a *right* shoulder vascular malformation, and *right-sided* pain and flushing. *See, e.g.*, Ex. 5 at 614, 631. These notations appear to be inadvertent; they are not corroborated by the evidence overall.

[10] This physiatrist was seeing Petitioner for the first time, nearly four years after the subject vaccination and injury onset. (He is different than the physiatrist Petitioner had seen previously, Ex. 5 at 404.)

[11] Allodynia is defined as "pain resulting from a non-noxious stimulus to normal skin." Dorland's, *Allodynia*, https://www.dorlandsonline.com/dorland/definition?id=1820&searchterm=allodynia (last accessed July 16, 2025).

At an August 27, 2019 appointment, the OHSU interventional radiologist listed the procedures to date for Petitioner's "complex L shoulder pain following vaccination," and listed the physiatrist's "working diagnoses includ[ing] SIRVA, adhesive capsulitis, and thoracic outlet syndrome involving C8." Ex. 5 at 803. The interventional radiologist stated that the visit's purpose was to evaluate whether the vascular malformation was compressing nerves – but he did not record any physical examination, testing, direct answer to that question, or diagnosis of his own. *Id.* The interventional radiologist wrote that Petitioner had "a temporally clear relationship of onset of pain with TDP injection in 7/21/15," which led to the discovery of a "congenital… asymptomatic" vascular malformation. *Id.* The interventional radiologist further opined that that because the vascular malformation had not responded to two embolization, it was not the cause of her pain. Ex. 5 at 803.

In October 2019, Petitioner followed up with the Kaiser physiatrist and was referred to a pain management clinic. Ex. 5 at 692-93, Her medical treatment was then put on hold due to the COVID-19 Pandemic. Brief at 4; Ex. 20 at 3. Further medical records (summarized by the parties, and independently reviewed by the Court) do not suggest any new understanding of Petitioner's medical picture – only numerous pain management efforts. *See* Rule 4(c) Report at 16-21 and Brief at 4-6 (internal citations omitted).

## IV. Table SIRVA Entitlement

I review below Petitioner's success at meeting the various SIRVA Table elements.

### A. No Prior History

Petitioner was not documented to have left shoulder pain, inflammation or dysfunction prior to her vaccination. *See generally* Ex. 4. Accordingly, the first QAI requirement is met. 42 C.F.R. § 100.3(c)(i).

### B. Onset

Medical records created as early as nine days post-vaccination, and then consistently thereafter, reflect that Petitioner reported developing new pain involving her shoulder within a day of vaccination. *See, e.g.*, Ex. 5 at 15, 25, 45, 40, 107, 337 (organized chronologically). There is no evidence suggesting an alternative onset for her shoulder pain. Thus, she has established 42 C.F.R. § 100.3(c)(ii).

### C. Pain and Reduced Range of Motion Were Not Limited to the Shoulder

Petitioner is somewhat correct (*see* Brief at 8), that this third QAI criteria, at 42 C.F.R. § 100.3(c)(10)(iii), is not automatically defeated by evidence of *some* degree of symptoms outside of the vaccinated shoulder. I have previously stated that "claims involving musculoskeletal pain primarily occurring in the shoulder are valid under the Table even if there are additional allegations of pain extending to adjacent parts of the body, since the essence of the claim is that a vaccine administered *to* the shoulder *primarily* caused pain there." *Valdez v. Sec'y of Health & Hum. Servs.*, No. 21-0394V, 2024 WL 1526536 (Fed. Cl. Spec. Mstr. Feb. 28, 2024), citing *Cross v. Sec'y of Health & Hum. Servs.*, No. 19-1958V, 2023 WL 120783, at *7 (Fed. Cl. Spec. Mstr. Dec. 2, 2022). "Determining whether the pain is predominant to the shoulder, or reflects a more systemic injury, is part of the balancing of evidence performed by special masters." *Id.* In *Valdez*, I also noted that the third QAI's purpose is to "guard against compensating claims involving patterns of pain or reduced range of motion indicative of a contributing etiology beyond the confines of a musculoskeletal injury to the affected shoulder." *Id.* (citing *Grossman v. Sec'y of Health & Hum. Servs.*, No. 18-0013V, 2022 WL 779666 at *15 (Fed. Cl. Spec. Mstr. Feb. 15, 2022)).

The record in this case, however, does not support the conclusion that pain outside of the vaccinated shoulder was incidental or peripheral to Petitioner's overall condition, such that it could reasonably be distinguished. Rather, the evidence shows that Petitioner suffered pain radiating down the arm, and reduced range of motion *in her elbow*, within days after her vaccination. She continued to suffer pain and other sensory symptoms throughout her left arm, and sometimes pain in her left upper back and neck, for years. *See, e.g.*, Ex. 5 at 17, 44, 47, 258 – 59, 283, 302 – 03, 309, 319, 347, 731, 404, 546, 652, 695, 731; Ex. 20 at 1; Ex. 21 at 18. At best, these symptoms were less constant and/or less disruptive than the primary complaint of shoulder pain. But the non-shoulder symptoms also suggest a more complex injury of a kind not contemplated by the Table SIRVA listing. *See* Ex. 5 at 652 (physiatrist's endorsement that Petitioner's vaccination had caused 1) SIRVA and 2) a left C8 pattern of symptoms, both beginning within 48 hours). Petitioner has thus not established the third QAI requirement.

### D. Potential Other Explanation

Finally, to make out a Table SIRVA, a petitioner must establish that there is no other condition or abnormality present that would explain her symptoms. 42 C.F.R. § 100.3(c)(10)(iv). This reflects an *affirmative* burden borne by the claimant (since she must meet all QAIs to obtain the benefits of a Table claim, where causation is presumed). As a result (and unlike in the context of a causation-in-fact claim), a SIRVA petitioner cannot

evade this kind of evidence as easily as can be done in a non-Table context.[12] The confounding evidence need not be definitive or universally accepted by treating providers.[13] Past Table SIRVA claims have been foreclosed by a variety of evidence of such alternative/comorbid conditions.[14]

Respondent argues that there is "substantial and robust evidence" that Petitioner's post-vaccination symptoms may be explained by the congenital vascular malformation located within her shoulder. Rule 4(c) Report at 23 – 24; *see also* Response at 4 – 7 and n. 2. The record favors Respondent's position over Petitioner's objections.

Petitioner first contends that her treating medical providers "ruled out the AVM as the source of her pain after significant treatment failed to change her symptoms." Brief at 9, citing Ex. 5 at 798, 652. But a treating medical provider's opinion is "not sacrosanct." *Snyder v. Sec'y of Health & Hum. Servs.*, 88 Fed. Cl. 706, 746 n. 67 (2009). Rather, a treater's opinion is only as trustworthy as the reasonableness of its suppositions or bases. Treaters' views should be weighed against other, contrary evidence also present in the record – including conflicting opinions among such individuals. *Hibbard v. Sec'y of Health & Hum. Servs.*, 100 Fed. Cl. 742, 749 (2011) (not arbitrary and capricious for special master to weigh competing treating physicians' opinions against each other), *aff'd*, 698

---

[12] *See, e.g.*, *Durham v. Sec'y of Health & Hum. Servs.*, No. 17-1899V, 2023 WL 3196229 (Fed. Cl. Spec. Mstr. Apr. 7, 2023) at *14 (explaining that 42 C.F.R. § 100.3(c)(10)(iv), "it is petitioner herself that bears the burden of showing that any evidence of [the alternative condition] is not meaningful"); *Rance v. Sec'y of Health & Hum. Servs.*, No. 18-0222V, 2023 WL 6532401, at *29 (Fed. Cl. Spec. Mstr. Sept. 11, 2023) (citing *Durham*); *French v. Sec'y of Health & Hum. Servs.*, No. 20-0862V, 2023 WL 7128178, at *6 (Fed. Cl. Spec. Mstr. Sept. 27, 2023) ("[T]his Table element does not impose on Respondent the obligation to prove an alternative cause, but instead merely that the record contains sufficient evidence of a competing explanation to 'muddy' a finding that vaccine administration was the cause"); *French*, 2023 WL 7128178, at n. 8 ("this Table element expressly requires the *petitioner* to show no other 'condition or abnormality').

[13] *Poore v. Sec'y of Health & Hum. Servs.*, No. 21-0371V, 2025 WL 1453895, at * (Fed. Cl. Spec. Mstr. Apr. 23, 2025) (observing that the treating providers differed in their opinions – but specialists capable of performing "more sophisticated assessment" were likely more relevant, and that any record "ambiguity does not help [the] petitioner because she bears the burden of proof in demonstrating that her condition fits within the specific requirements of the QAI").

[14] *See, e.g.*, *Durham*, 2023 WL 3196229 at *14 - 15 (cervical radiculopathy); *Lindsey v. Sec'y of Health & Hum. Servs.*, No. 20-1650V, 2023 WL 4858539 at *8 – 9 (Fed. Cl. Spec. Mstr. June 8, 2023) (calcific tendinosis); *Harris v. Sec'y of Health & Hum. Servs.*, No. 22-0432V, 2025 WL 1517988 at *7 – 8 (Fed. Cl. Spec. Mstr. Apr. 23, 2025) (also calcific tendinosis); *French v. Sec'y of Health & Hum. Servs.*, No. 20-0862, 2023 WL 7128178 at *6 (Fed. Cl. Spec. Mstr. Sept. 27, 2023) (pre-vaccination rotator cuff repair, with sequela including a decrease in marrow edema and mild fluid along the screw); *Miller v. Sec'y of Health & Hum. Servs.*, No. 20-0531V, 2024 WL 3699521 at *7 – 8 (Fed. Cl. Spec. Mstr. July 8, 2024) (exercise injury); *Sullivan v. Sec'y of Health & Hum. Servs.*, No. 22-1374V, 2024 WL 5199729 at *7 – 8 (Fed. Cl. Spec. Mstr. Nov. 18, 2024) (chronic regional pain syndrome and/or carpal/cubital tunnel syndrome); *Alexander v. Sec'y of Health & Hum. Servs.*, No. 21-0786V, 2025 WL 604764 at *7 (Fed. Cl. Spec. Mstr. Jan. 14, 2025) (ankylosing spondylitis and/or cervical radiculopathy).

F.3d 1355 (Fed. Cir. 2012), *Veryzer v. Sec'y of Health & Hum. Servs.*, No. 06-522V, 2011 WL 1935813, at *17 (Fed. Cl. Spec. Mstr. Apr. 29, 2011), *mot. for review den'd*, 100 Fed. Cl. 344, 356 (2011), *aff'd without opinion*, 475 F. Appx. 765 (Fed. Cir. 2012). Moreover, a special master is obligated to consider "the entire record and the course of the injury… until the date of the judgment". Section 13(b)(1).

In this case, the record suggests the AVM diagnosis has ample support, even if some treaters did not embrace it. In 2019, the OHSU interventional radiologist wrote that Petitioner's vascular malformation did not explain her symptoms – but his rationale for saying so is not particularly clear. Regarding the lack of response to two embolizations, Ex. 5 at 803, the radiologist had previously warned that such procedures were not curative, *id.* at 373, 763, and he was not willing to perform a third embolization because of the risks of vascular or nerve injury, *id.* at 714. He had previously acknowledged that Petitioner's treatment options were limited due to the malformation's site. *Id.* at 752. He did not acknowledge that numerous orthopedic evaluations and *seven* MRIs had not detected any specific, alternative musculoskeletal explanation that would explain the injury. This "ruling out" of the AVM also depended heavily on the AVM being apparently asymptomatic beforehand, and the vaccine's temporal association with the onset of shoulder pain. For all of these reasons, the radiologist's disclaiming of the malformation is not sufficiently supported by record evidence to give it great weight.

Neither does the Kaiser physiatrist help this Table SIRVA requirement. That physiatrist *endorsed* a causal role for the malformation – reasoning that its proximity to the glenohumeral joint and brachial plexus/ brachial musculature might explain Petitioner's suspected thoracic outlet syndrome/ C8 pattern of symptoms. Ex. 5 at 652. And he did not explain why this issue would not also cause shoulder pain, despite opining in a rather conclusory fashion that Petitioner had a second, "separate pain generator" of SIRVA. *Id.* Again, the physiatrist's opinion seems influenced by the temporal association with the vaccine, rather than evidence that diminished the AVM as a confounding factor. Further explanation would be necessary to rule out this potential alternative explanation.

The OSHU vascular anomaly clinic's initial evaluation record (Ex. 5 at 731 - 32) further cuts against Petitioner, under 42 C.F.R. § 100.3(c)(10)(iii). That record explains the expected natural history of a vascular malformation. The condition is congenital and can be asymptomatic for years. Over time, the affected veins dilate and clots calcify – resulting in pain.[15] The pain's onset does not seem to depend on any "trigger" or inciting

---

[15] Indeed, after the OHSU vascular anomaly specialists handed off Petitioner for treatment, the interventional radiologist *concurred* that Petitioner's malformation contained those calcified clots, termed phleboliths. Ex. 5 at 752.

14

event (except possibly for "proportional growth expected… during childhood" and hormonal shifts, Ex. 5 at 732).[16]

Finally, it is relevant that the Kaiser orthopedist and sports medicine specialists accepted the vascular malformation as likely explaining Petitioner's symptoms. They did not identify any unrelated musculoskeletal injury, let alone implicate any such injury or the vaccine directly. Ex. 5 at 338 – 40, 343 – 44, 597. Overall, the medical record evidence preponderates in favor of the vascular malformation as potentially explaining Petitioner's injury. Therefore, Petitioner has not established the fourth QAI criteria.[17]

### E. Table SIRVA Conclusion

In light of Petitioner's inability to establish all QAI requirements at 42 C.F.R. §§ 100.3(c)(10)(i) and (iv), she is not entitled to compensation on its basis, warranting the Table SIRVA claim's dismissal.

### V. Any Alternative Off-Table Claim is Time-Barred

In many cases, the fact that a petitioner cannot meet a Table definition or requirement does not constitute the end of the case, since the claimant might well be able to establish a non-Table, causation-in-fact version of the claim not subject to those requirements. Here, for example, Petitioner might be able to show that a preexisting shoulder injury was exacerbated by the flu vaccine (assuming that he could meet the three elements of the test set forth in *Althen v. Sec'y of Health & Human Servs.*, 418 F.3d 1274 (Fed. Cir. 2005)).

But Petitioner's ability to refashion her claim into a non-Table cause of action is not possible under the circumstances. She did not file a Vaccine Program claim by the standard statutory deadline of thirty-six (36) months after the onset of her vaccine injury, e.g., by late July 2018. Her improperly-filed state court claim would have tolled the

---

[16] In this sense, a vascular malformation resembles calcific tendinosis – another condition that has foreclosed several past Table SIRVA claims. *Lindsey*, 2023 WL 4858539; *Harris*, 2025 WL 1517988; *see also Molina v. Sec'y of Health & Hum. Servs.*, No. 20-0845V, 2024 WL 4223393, at *10 (Fed. Cl. Spec. Mstr. Aug. 15, 2024) (reviewing that calcific tendinosis occurs gradually, the "formative" phase is usually not painful, but the "resorptive" phase can involve acute, sudden pain).

[17] Respondent also suggested that Petitioner's injury could be explained by CRPS. While the medical records reflect Petitioner's own suspicion of that diagnosis, it was *ruled out* by the Kaiser physiatrist in 2019, Ex. 5 at 652. Additionally, CRPS was first invoked several years post-vaccination – which would not necessarily explain the *initial* onset of a shoulder injury, but rather suggest a progression of symptoms that were not successfully managed.

Vaccine Act's statute of limitations *if* it had been filed by late July 2018 – but that claim was not filed until six months past that deadline, on January 20, 2019.

In some cases, the Act's "lookback" provision (Section 16(b)) can save certain kinds of otherwise-untimely filed cases. That provision is triggered by a Table revision, and allows petitioners to file a claim that would be untimely within two years of the revision's effective date, based on vaccine-related injuries suffered during the eight years prior to the revision. Section 16(b). Thus, because the Vaccine Table was revised in March 2017 to include a claim for a SIRVA, the present claim could have been deemed timely had it asserted a viable Table claim (since (i) January 2019 is within two years of the Table revision, and (ii) the claim is based on an injury alleged to have been incurred in the July 2015 – approximately two years before the amendment).

I have previously determined, however, that the lookback provision does not save *non-Table, causation-in-fact versions* of an otherwise-untenable Table claim. Rather, once it is determined that a claim cannot satisfy the Table requirements, the lookback provision no longer applies. *See, e.g.*, *Randolph v. Sec'y of Health & Human Servs.*, No. 18-1231V, 2020 WL 542735, at *8 (Fed. Cl. Spec. Mstr. Jan. 2, 2020) (closing case after dismissal of Table flu-GBS claim); *Christensen v. Sec'y of Health & Hum. Servs.*, No. 18-1477V, 2021 WL 2419720 (Fed. Cl. Spec. Mstr. May 12, 2021) (Table SIRVA claim); *Clavio v. Sec'y of Health & Hum. Servs.*, No. 18-1231V, 2022 WL 1078175 (Fed. Cl. Spec. Mstr. Feb. 16, 2022) (Table SIRVA claim). My determination is in line with prior decisions from other special masters. *Gorski v. Sec'y of Health & Human Servs.*, No. 97-156V, 1997 WL 739497, at *6 (Fed. Cl. Spec. Mstr. Nov. 13, 1997). Petitioner has not acknowledged this past case law, while Respondent contends that an-off Table allegation is time-barred. Rule 4(c) Report at 24 – 25; Response at 7.

As a result, no causation-in-fact claim is tenable due to the untimely filing of the matter. A claim based on a Tdap vaccine-associated injury *could* have been brought before addition of SIRVA to the Table. But the facts of this case would have required Petitioner to initiate the claim in the summer of 2018. And Petitioner has not established any basis for equitable tolling either.

Petitioner has benefited from the Act's lookback provision even if a causation version of her claim is barred. Despite filing her claim out of time, she and Respondent explored the potential of a settlement compensation award. The evidence in support of the claim was substantively reviewed. But the failure of the untimely Table version of the claim precludes further litigation of any other form of the claim that could have been asserted by July 2018 but was not.

## Conclusion

For the foregoing reasons, Petitioner's claim is **DISMISSED**. In the absence of a timely-filed motion for either reconsideration or review (see Appendix B to the Rules of the Court), the Clerk shall enter judgment in accordance with this Decision.[18]

**IT IS SO ORDERED.**

**s/Brian H. Corcoran**
Brian H. Corcoran
Chief Special Master

---

[18] Pursuant to Vaccine Rule 11(a), the parties may expedite entry of judgment by filing a joint notice renouncing their right to seek review.