# In the United States Court of Federal Claims

No. 21-1185

(Filed: 28 January 2026[*])

\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*

|  |  |
|---|---|
| MIRANDA CHU, | \* |
|  | \* |
| Petitioner, | \* |
|  | \* |
| v. | \* |
|  | \* |
| SECRETARY OF HEALTH AND HUMAN | \* |
| SERVICES, | \* |
|  | \* |
| Respondent. | \* |
|  | \* |

\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*

*Jason L. Jorgenson*, of Philbrook Law, of Vancouver, WA, and *Amber D. Wilson*, Wilson Science Law, of Washington, DC, for petitioner.

*Adam N. Muffett*, Trial Attorney, Torts Branch, Civil Division, U.S. Department of Justice, of Washington, DC, for respondent.

## OPINION AND ORDER

**HOLTE**, **Judge.**

"[W]hile most of the Nation[] enjoy[s] a greater benefit from immunization programs, a small but significant number have been gravely injured." *Cloer v. Sec'y of Health & Hum. Servs.*, 654 F.3d 1322, 1325 (Fed. Cir. 2011) (quoting H.R. Rep. No. 99-908, at 4 (1986)); *see also Boatmon v. Sec'y of Health & Hum. Servs.*, 941 F.3d 1351, 1364 (Fed. Cir. 2019) (Newman, J., dissenting) (quoting *National Childhood Vaccine-Injury Compensation Act: Hearing on S.2117 Before the S. Comm. on Labor & Human Res.*, 98th Cong. 2 (1984) (statement of Sen. Orrin Hatch, S. Comm. on Labor & Human Res.) ("Senator Hatch cautioned, there is 'a small but significant public health problem—the incidence of harmful and occasionally even fatal reactions to vaccines administered'"). "These few but important injuries create doubts and fears in our National Childhood Vaccination Programs." *Boatmon*, 941 F.3d at 1364 (quoting *National Childhood Vaccine-Injury Compensation Act: Hearing on S.2117 Before the S. Comm. on Labor & Human Res.*, 98th Cong. at 3–4) (statement of Sen. Edward Kennedy, S. Comm. on Labor & Human Res.). "'[F]or the relatively few who are injured by vaccines,'" Congress

---

[*] This opinion was initially filed under seal on 13 January 2026 pursuant to Vaccine Rule 18(b) of the Rules of the Court of Federal Claims. The Court provided the parties 14 days to submit proposed redactions, if any, before the opinion was released for publication in accordance with Rule 18(b). Neither party proposed redactions. This opinion is now reissued for publication in its original form.

determined the "'opportunities for redress and restitution [were] limited, time-consuming, [and] expensive.'" *Cloer*, 654 F.3d at 1325 (quoting H.R. Rep. No. 99-908, at 6 (1986)). Congress, therefore, established the Vaccine Program to "compensate injured persons quickly and fairly" for injuries "either presumed or proven to be causally connected to vaccines." *Id.*

"It is well-established that the Vaccine Act is a 'pro-claimant regime' meant to allow injured individuals a fair and fast path to compensation." *J.A.C. v. Sec'y of Health & Hum. Servs.*, No. 2025-1751, 2025 WL 3749714, at *1 (Fed. Cir. Dec. 29, 2025) (citing *K. G. v. Sec'y of Health & Hum. Servs.*, 951 F.3d 1374, 1380 (Fed. Cir. 2020)). The Office of Special Masters is tasked with furnishing a "less-adversarial, expeditious, and informal proceeding" with "flexible and informal standards of admissibility of evidence." 42 U.S.C. § 300aa-12(d)(2). In furtherance of a less adversarial, expeditious, and informal proceeding, Congress created a Vaccine Injury Table for various vaccine injuries, enumerating prerequisites (*i.e.*, QAIs) which confer a presumption of causation when satisfied. One of the vaccine injuries is Shoulder Injury Related to Vaccine Administration ("SIRVA"). For SIRVA Table claims (which award a median of $50,000 to $130,000 based on the posture of the claim),[1] a petitioner is only required to satisfy each prerequisite, effectively showing the petitioner received the vaccine and experienced musculoskeletal injury and reduced range of motion of the shoulder, in exchange for a presumption the vaccine caused the injury. The Table is not intended to preclude petitioner from compensation for a Table SIRVA claim (for the shoulder injury) just because petitioner suffers from a separate neuropathy in other regions near the shoulder (potentially compensable under a disparate off-Table claim). Despite these alleviated procedural requirements, here, after four years of litigation and nearly a decade after petitioner's date of injury, the Office of Special Masters denied entitlement without articulating a rational basis for the decision. Specifically, without rational analysis, the Office of Special Masters: (1) relied on *Grossman v. Secretary of Health and Human Services*—a 2022 special master decision on which the Office has increasingly relied—to elevate the requirements of QAI 3 from a simple checklist to an arduous causation-in-fact analysis; and (2) challenged the veracity of contemporaneous medical opinions, disregarding more recent diagnoses from specialists in favor of earlier, preliminary diagnoses (all without expert testimony). *See infra* Section VIII.

---

[1] According to an opinion penned by the Chief Special Master on 23 August 2024 detailing compensation trends for SIRVA Table claims, petitioners were awarded a median of: $85,920.03 in cases where the special master decided compensation; $80,240.98 in cases where the government proffered damages; $130,000.00 in cases where the government stipulated to damages; and $50,000.00 in cases where the government stipulated to agreement. *See Yodowitz v. Sec'y of Health & Hum. Servs.*, No. 21-0370, 2024 WL 4284926, at *2–3 (Fed. Cl. Spec. Mstr. Aug. 23, 2024) (Corcoran, C.S.M.). Given the government pays attorneys' fees for vaccine petitions and with the median of all SIRVA Table claims less than $130,000 in damages, the Court notes the costs to litigate this case in attorneys' fees—and consequently the total financial burden imposed on taxpayers—may exceed the entirety of the relief sought. The Court reminds the government to be wary of the scorched-earth litigation strategy employed in cases where attorneys' fees are paid to counsel such as in vaccine cases and in rails-to-trails cases. For example, in *Hippely v. United States* (a rails-to-trails case), plaintiff sought to recover over $400,000 in attorneys' fees and costs for a taking valued at less than $2,000. 173 Fed. Cl. 389, 399 (2024). This strategy—reimbursing plaintiffs for exorbitant attorneys' fees and costs despite recovering nominal compensation—is hardly novel. *See, e.g., id.* (citing *Caquelin v. United States*, 959 F.3d 1360, 1362 (Fed. Cir. 2020)) (noting the "parties [in *Caquelin*] stipulated to compensation of $900" and the government paid $1 million in legal fees); *id.* (citing *Memmer v. United States*, 50 F.4th 136 (Fed. Cir. 2022) (explaining "the government[] agreed to a settlement of $1.7 million in fees and costs in *Memmer*[] when $29,000 in damages were at issue")).

The facts regarding petitioner's alleged shoulder injury are straightforward. On her nineteenth birthday almost ten years ago, petitioner visited her primary care physician's office for an annual physical exam and to secure medical clearance before starting a phlebotomy program at Clark College in Vancouver, WA. At her visit, the doctors noted she was generally healthy without any significant medical history and presented no complaints or concerns. As part of her routine doctor's visit, she received a Tetanus-diphtheria-acellular pertussis vaccination in her left arm. Nine days later, petitioner returned to her doctor's office with new pain, numbness, and reduced range of motion in her left shoulder and elbow. Through years of doctor's appointments and procedures, petitioner has suffered severe chronic pain, precluding routine activities. Petitioner has struggled to exercise at the gym, ride her motorcycle, shift gears in her manual transmission vehicle, or adequately sleep. *See infra* Section I.

In 2021, petitioner filed a petition for compensation alleging she suffered a SIRVA. After the Office of Special Masters denied petitioner entitlement, petitioner filed a Motion for Review in this court. During the Court's review, the government has exhaustively taken issue with the most basic aspects of this case—disputing the Court's statement the shoulder is connected to the arm, challenging well-settled Federal Circuit precedent, opposing the veracity of a signed treating physician's notes stating he conducted a physical examination with petitioner, and disagreeing with medical doctors on their diagnoses. *See infra* Section VI.A, n.5, n.6, n.14. These disagreements delayed petitioner a quick decision and fundamentally undermined the Vaccine Act's aim of less-adversarial, expeditious, and informal proceedings. *See infra* Section VIII. The province of the government and the Office of Special Masters in vaccine cases is not—and Congress never so intended—to nitpick minute fibers of petitioner's treating physicians' medical opinions. *See infra* Section VIII, n.14, n.15. For the following reasons, the Court grants petitioner's Motion for Review, vacates the Chief Special Master's decision denying entitlement, and remands to the Chief Special Master for further proceedings consistent with this opinion.

## I.    Petitioner's Medical History and Tdap Vaccination

On 21 July 2015, petitioner received a Tdap vaccination ("the vaccine") in her left arm during a primary care appointment. *See* 21 July 2015 Visit Summary at The Vancouver Clinic, Ex. 5 at 3–4, ECF No. 1-7. At the time of vaccination, petitioner was a 19-year-old who "[was] generally healthy without a significant past medical history." *Id.* at 4. On 30 July 2015, after the vaccination, petitioner returned to the Clinic because of "decreased [Range of Motion ("ROM")] in left shoulder and left elbow[, p]ain in left shoulder and upper arm and numbness/tingling down her arm." *See* 30 July 2015 MPAS Progress Notes, Ex. 5 at 15. Petitioner reported "no pain, numbness or ROM problems before vaccination." *Id.* A physical examination found tenderness and reduced ROM in her shoulder and elbow, and a positive Tinel sign at the elbow. *Id.* at 15–17. Petitioner was referred to physical therapy ("PT"), where the therapist noted a medical diagnosis of "pain in shoulder," and "[i]njury of ulna nerve." *See* 24 August 2015 PT Initial Eval., Ex. 5 at 45–46. The physical therapist noted, at the initial evaluation, "[p]atient presents with decreased [Active Range of Motion], weakness in [Left Upper Extremity], parasthesias and pain in ulnar nerve dermatome with positive [Upper Limb Tension Test] and scapular [d]yskinesia." *See id.* at 47. After several months of PT, petitioner still reported "[h]er shoulder [was] still irritable[, and was] bothered mostly by external rotation, range of motion

directly above her head." *See, e.g.*, 9 June 2016 Treating Provider's Notes from Rebound Orthopedics, Ex. 5 at 176. *See also, e.g.*, 12 August PT Notes, Ex. 5 at 25 (petitioner "[c]annot sleep on her left side[, experiences pain] with reaching back to tuck a shirt in or fasten her bra[,] reach[ing] up to fix her hair[,] reach[ing] laterally[, and] [c]annot work out in the gym"); 9 September 2015 Rebound Physical Daily Note, Ex. 5 at 55 (petitioner "cannot drive more than 30 minutes due to severe pain from having to hold the steering wheel with left arm for manual transmission"); 14 January 2016 PAC Notes from Rebound Orthopedics, Ex. 5 at 915 (petitioner reporting "[s]he has difficulty driving and riding her motorcycle);

On 2 October 2015, petitioner underwent her first magnetic resonance imaging ("MRI") test, which showed "no rotator cuff tear[;] [a] large ganglion associated with subscapular recess of glenohumeral joint[; and] posterior glenoid labrochondral irregularity of uncertain significance[ but] no anterior labral tear or bony evidence of previous dislocation." *See* 2 October 2015 MRI Report, Ex. 5 at 37–38. In November 2015, petitioner underwent a diagnostic ultrasound where the doctor "was not able to identify an[y] hypoechoic areas suggestive of a fluid accumulation at the subcoracoid bursa," and noted the diagnosis remained "[s]ubcoracoid bursitis of left shoulder." *See* Diagnostic Musculoskeletal US Evaluation, Ex. 5 at 74. Doctors suspected petitioner suffered from a ganglion cyst in the subcoracoid bursa (which may have preexisted the injection). *See* 15 October 2015 Dr. Ragsdale Analysis, Ex. 5 at 40–42. A subsequent orthopedist "reviewed her imaging including her MRI which reveals the cyst," and as "[t]he cyst is in the region of the subscapularis," "th[ought] it would be reasonable to continue with physical therapy at this time and get a repeat MRI approximately 3 months from the original MRI." 16 December 2015 Dr. DaSilva Visit Summary, Ex. 5 at 107.

Then, on 5 January 2017 and 3 March 2017, petitioner underwent MRI arthrograms with and without contrast, and upon inspection, a doctor opined petitioner has a lesion which "likely represents a benign or low-grade mass and could be a myxoma or lymphatic or possibly vascular malformation." 6 March 2017 MRI Left Shoulder WO/W Contrast Notes, Ex. 5 at 372–73. On 29 March 2017, petitioner reported "pain about the [left] shoulder girdle particularly with activities . . . occasional episodes of pain radiating down the arm as well as paresthesia along the ulnar border of the forearm and in the 3rd, 4th, 5th finders." *See* Kaiser March Medical Report, Ex. 5 at 347. On 8 August 2017, petitioner started care at Oregon Health and Science University ("OHSU") and reported left shoulder pain and reduced ROM beginning the day of vaccine administration. *See* 8 August 2017 OHSU Medical Report, Ex. 5 at 731. A vascular anomaly resident/fellow at OHSU noted petitioner has a "vascular malformation of the left shoulder" and discussed potential origins for the vascular malformations. *Id.* at 732–33 (also noting an attending physician concurred with the resident/fellow's conclusion). The OHSU vascular anomaly team recommended petitioner follow up with Dr. Kaufman (an OHSU interventional radiologist) for possible sclerotherapy. *Id.*

On 9 January 2018, petitioner visited Dr. Kaufman, who noted "[the malformation did] not appear to involve the neurovascular by imaging but is associated with local pain, decreased ROM, and tingling in fingers. It is deeply located in the subcoracoid soft tissues and laterally abuts the coracoid process. There is no apparent joint involvement. Percutaneous access to the lesion will be challenging due to the location deep to the scapula and difficulty with US [ultrasound] visualization will likely require fluoroguidance with bony landmarks." *See* 9

January 2018 OHSU Medical Progress Report, Ex. 5 at 752.  Dr. Kaufman suggested PT evaluation and prescribed gabapentin for pain.  *Id*.  On 6 February 2018, though recent PT evaluations were "very encouraging" regarding an improvement in petitioner's range of motion and symptoms, Dr. Kaufman noted gabapentin had not relieved petitioner's pain.  6 February 2018 OHSU Progress Report, Ex. 5 at 763.  Soon thereafter, on 10 April 2018, the radiologist recorded petitioner stopped taking gabapentin due to side effects and was pursuing acupuncture, and because "pain [was] now dominating her life and adversely [a]ffecting her activities," petitioner elected to undergo an embolization—which "is not curative, but performed to control symptoms."  *See* 10 April 2018 Office Visit in Interventional Radiology, Ex. 26 at 372–74.  After the first embolization on 2 July 2018, petitioner reported some improvement in symptoms, but noted pain and weakness in her hand.  *See* 21 August 2018 OHSU Office Visit in Interventional Radiology, Ex. 26 at 236–38; 2 July 2018 IR Angio Embolization Vascular Malformation Notes, Ex. 5 at 307–08.  Dr. Kaufman noted "[n]o significant change in the [Vascular Malformation ("VM")] from the last embolization, which was very limited but associated with symptomatic improvement," and would consider repeating the embolization with a "posterior clavicular approach."  21 August 2018 OHSU Office Visit in Interventional Radiology, Ex. 26 at 237–38.

Given the absence of improvements and new factual findings, on 1 October 2018, Dr. Kaufman performed a second embolization.  *See* 1 October 2018 IR Angio Embolization Vascular Malformation Notes, Ex. 26 at 147–48.  Dr. Kaufman noted petitioner reported her pain was only "minimally better," was "frustrated with [the] lack of response," and was "ta[]king time off from scho[o]l."  *See* 23 October 2018 OHSU Office Visit in Interventional Radiology, Ex. 26 at 122.  A few months later, in January 2019, the radiologist recorded he did not want to offer Petitioner a third embolization given the risk of further injury and noted "I think we should re-image the VM and also re-evaluate her shoulder for potential adhesive capsulitis or other pathology that would more directly explain the pain and limited ROM.  The VM would more likely cause deep pain in the medial shoulder."  8 January 2019 OHSU Office Visit in Interventional Radiology, Ex. 5 at 829.

In Spring 2019, petitioner requested to be assessed for chronic regional pain syndrome ("CRPS"), and on 3 June 2019, a physiatrist named Dr. Kaul evaluated Petitioner's left shoulder and arm to rule out CRPS.  3 June 2019 Dr. Kaul Office Visit, Ex. 5 at 652.  Dr. Kaul stated:

> On my examination today / review of imaging / review of case, she appears to have two separate pain generators.  One is the shoulder and appears to be (SIRVA) shoulder injury related to vaccine administration. . . .  The other appears to be a thoracic outlet syndrome / C8 pattern of symptom(s).

*Id.*  The physiatrist requested Dr. Kaufman's opinion as to whether the VM was "impacting the brachial plexus."  *Id.* at 653.  On 27 August 2019, petitioner visited Dr. Kaufman to ascertain his opinion as to whether AVM was a correct diagnosis.  After performing a "medical record review, history, physical exam, and formulation of a treatment plan,"  Dr. Kaufman found:

> The patient has a temporally clear relationship of onset of pain with TDP injection in 7/21/15.  She has not responded to shoulder surgery or toe embolization

> procedures.   The venous malformation located at the superior end of the
> subscapularis.  This is a congenital lesion that was asymptomatic and only came to
> light as a result of work-up for the pain that is directly related to the vaccination.
> As she has not had any real response to two embolizations, *I do not think that the
> VM is the cause of her pain*, or that repeat embolization would be fruitful unless
> required in order to focus on other diagnoses.

27 August 2019 OHSU Office Visit in Interventional Radiology, Ex. 5 at 803 (emphasis added).
On 2 October 2019, Dr. Kaul noted this assessment by Dr. Kaufman and found petitioner had
CRPS:

> Patient does meet criteria for CRPS.   Dr. Kaufman @ OHSU does not think the
> AVM is source of her symptom(s); rather is congenital that came to light after
> shoulder injury related to vaccine administration.

2 October 2019 Dr. Kaul Office Visit, Ex. 5 at 692.  Petitioner's treatment was thereafter put on
hold due to the COVID-19 pandemic, until late 2022, when she continued to report left shoulder
pain radiating into her fingers to a doctor at Hudson Bay Medical Group—petitioner reports she
is unable to work a full-time job.  Mot. for Rev. at 5.

## II.    The Petition and Procedural History Before the Special Master

On 12 April 2021, petitioner filed a petition alleging a SIRVA as a direct result of her
Tdap vaccination.  Pet. at 1, ECF No. 1.  Petitioner asserted her injury was a "Table Injury"
under 42 C.F.R. § 100.3(a).  *Id.*  The petition was assigned to Chief Special Master Corcoran in
September 2022, and the parties engaged in settlement discussions before "reaching an impasse"
in May 2024.  SM Dec. at 2; Notice of Assignment, ECF No. 4; Gov't's Rule 4(c) Report, ECF
No. 48.  In its Rule 4(c) Report opposing compensation, the government noted "[p]etitioner's
evidence does not support a Table injury[,] petitioner has failed to plead a cause in fact claim or
prove a causal link between her July 21, 2015 Tdap vaccination, and her alleged shoulder pain,"
and requested the Chief Special Master dismiss the case.  Gov't's Rule 4(c) Report at 26.  On 9
October 2024, the Chief Special Master ordered petitioner to "file any additional evidence [it]
wishes to have considered[] and a [b]rief addressing the issues raised in Respondent's Rule 4(c)
Report," and "Respondent [to] file any additional evidence [it] wishes to have considered and a
[r]esponse [b]rief within 60 days thereafter."  9 October 2024 Scheduling Order, ECF No. 49.
Petitioner filed an opening brief on 8 January 2025, *see* Pet's Memo., ECF No. 52, and the
government filed a response brief on 10 March 2025, *see* Gov't's Memo., ECF No. 53.
Petitioner did not file a reply.  *See generally* SM Dec. at 2.  The Chief Special Master did not
hold an evidentiary hearing or order the parties to file expert reports in the case.  *See generally
id*. at 4.

On 18 July 2025, the Chief Special Master found "Petitioner has not preponderantly
established a Table SIRVA[—]specifically the requirements of an injury limited to the shoulder
and elimination of the potential alternative explanation of a pre-existing vascular malformation
within the shoulder," and dismissed the petition.  SM Dec. at 2.  The Chief Special Master also

found, insofar as petitioner's SIRVA Table claim fails, petitioner's claim for a related Off-Table claim is time-barred. *Id.* at 15–16.

### A.    The Special Master's Analysis of QAI Factors

The Chief Special Master started by discussing the criteria to establish a SIRVA Table claim. First, the Chief Special Master explained "a SIRVA is compensable if it manifests within 48 hours of the administration of a covered vaccine." SM Dec. at 3 (citing 42 C.F.R. § 100.3(a)). Second, after petitioner showed pain manifested within 48 hours of vaccine administration, the Chief Special Master then reviewed whether petitioner satisfied four QAI:

> (i) No history of pain, inflammation or dysfunction of the affected shoulder prior to intramuscular vaccine administration that would explain the alleged signs, symptoms, examination findings, and/or diagnostic studies occurring after vaccine injection;
> (ii) Pain occurs within the specified time frame;
> (iii) Pain and reduced range of motion are limited to the shoulder in which the intramuscular vaccine was administered; and
> (iv) No other condition or abnormality is present that would explain the patient's symptoms (e.g., NCS/EMG or clinical evidence of radiculopathy, brachial neuritis, mononeuropathies, or any other neuropathy).

42 C.F.R. § 100.3(c)(10).

Under QAI 1, relating to whether petitioner has a history of pain, inflammation, or dysfunction of the affected shoulder prior to vaccine administration, the Chief Special Master found petitioner satisfied this requirement because "Petitioner was not documented to have left shoulder pain, inflammation or dysfunction prior to her vaccination." SM Dec. at 11 (citing Ex. 4.); *see also* 42 C.F.R. § 100.3(c)(10)(i).

Under QAI 2, relating to whether the onset of pain occurred within the time frame, the Chief Special Master found, given "[m]edical records [were] created as early as nine days post-vaccination . . . reflect[ing] that Petitioner reported developing new pain involving her shoulder within a day of vaccination," petitioner established QAI 2 because "[t]here is no evidence suggesting an alternative onset for her shoulder pain." SM Dec. at 11 (citing numerous exhibits); *see also* 42 C.F.R. § 100.3(c)(10)(ii).

Under QAI 3, relating to whether petitioner's symptoms are limited to the shoulder, the Chief Special Master found petitioner's record did not demonstrate the pain outside the vaccinated shoulder was incidental or peripheral to her overall condition. SM Dec. at 12. The Chief Special Master explained the evidence indicated petitioner had suffered pain radiating down the arm, reduced range of motion in her elbow, pain and other sensory symptoms throughout her left arm, and sometimes pain in her left upper back and neck—these non-shoulder symptoms, according to the Special Master, suggested a complex injury not contemplated by Table SIRVA claims requiring a causation-in-fact analysis. *Id.* Specifically, the Chief Special Master proclaimed the third QAI's purpose is to "guard against compensating claims involving

patterns of pain or reduced range of motion indicative of a contributing etiology beyond the confines of a musculoskeletal injury to the affected shoulder," and because petitioner's "symptoms were less constant and/or less disruptive than the primary complaint of shoulder pain," the Chief Special Master found petitioner failed to establish QAI 3. *Id.* (quoting *Valdez v. Sec'y of Health & Hum. Serv.*, No. 21-0394V, 2024 WL 1526536 (Fed. Cl. Spec. Master. Feb. 28, 2024) (Corcoran, C.S.M.) (citing *Grossman v. Sec'y of Health & Hum. Servs.*, No. 18-0013V, 2022 WL 779666, at *15 (Fed. Cl. Spec. Mstr. Feb. 15, 2022) (Horner, S.M.)).

Under QAI 4, which requires "[n]o other condition or abnormality [to be] present that would explain the patient's symptoms," SM Dec. at 4 (citing 42 C.F.R. § 100.3(c)(10)), the Chief Special Master found "substantial and robust evidence" indicating petitioner's post-vaccine symptoms can be explained by the congenital vascular malformation in her shoulder—rather than from the Tdap vaccine administration. *Id.* at 12. Considering petitioner bears the burden to establish all QAIs, the Chief Special Master noted "a SIRVA petitioner cannot evade" proffering evidence affirmatively showing no other condition or abnormality explains her symptoms. *Id.* at 12–13.

In evaluating QAI 4, the Chief Special Master assessed the record to determine whether there is substantial and robust evidence to determine whether "[p]etitioner's post-vaccination symptoms could be explained by the congenital vascular malformation located within her shoulder." *Id.* at 13 (citing Rule 4(c) Report at 23–24). In other words, the Chief Special Master narrowed the scope of the QAI 4 inquiry to whether petitioner ruled out AVM as causing the shoulder injury. *See id.* As a threshold matter, the Chief Special Master stated "a treating medical provider's opinion is 'not sacrosanct'" and is only as "trustworthy as the reasonableness of its suppositions or bases." *Id.* As a result, the Chief Special Master evaluated the bases of petitioner's medical providers' opinions in turn. *Id.* (citing *Snyder v. Sec'y of Health & Hum. Servs.*, 88 Fed. Cl. 706, 746 n.67 (2009)). First, looking at records from the petitioner's intervention radiologist in 2019, the Chief Special Master acknowledged petitioner's radiologist asserted the vascular malformation did not explain petitioner's symptoms—but noted "[the radiologist's] rationale for saying so is not particularly clear." SM Dec. at 14. The Chief Special Master noted the radiologist merely indicated embolizations were not curative and stated "Petitioner's treatment options were limited due to the malformation's site." *Id.* (citing Ex. 5 at 752). The Chief Special Master also highlighted, considering "numerous orthopedic evaluations and seven MRIs had not detected any specific, alternative musculoskeletal explanation that would explain the injury," the radiologist ruling out the AVM "depended heavily on the AVM being apparently asymptomatic beforehand, and the vaccine's temporal association with the onset of shoulder pain": as a result, the Chief Special Master concluded the temporal association of the onset of shoulder pain and the record evidence does not sufficiently support the radiologist's disclaiming of the vascular malformation as being the cause of petitioner's shoulder pain. *Id.* (emphasis omitted).

Next, the Chief Special Master evaluated the Kaiser physiatrist medical records and found the physiatrist's records also do not support petitioner's position. *Id.* According to the Chief Special Master, the physiatrist explained there may be a causal role for the malformation: given the proximity to the glenohumeral joint and brachial plexus/brachial musculature, the Chief Special Master interpreted the physiatrist's records as explaining how petitioner's

malformation might explain petitioner's thoracic outlet syndrome or C8 pattern of symptoms. *Id.* (citing Ex. 5 at 652). The physiatrist also opined two separate pain generators may cause petitioner's pain, but the Chief Special Master found the physiatrist's opinion to be "rather conclusory" because "the physiatrist's opinion seems influenced by the temporal association with the vaccine, rather than evidence that diminished the AVM as a confounding factor." *Id.* As a result, the Chief Special Master determined "further explanation would be necessary to rule out this potential alternative explanation," related to AVM not being a contributing factor to petitioner's shoulder injury. SM Dec. at 14.

Third, the Chief Special Master, after reviewing the OHSU vascular initial evaluation record, explained how a vascular malformation is congenital and can remain asymptomatic for years. *Id.* at 14. According to the Chief Special Master, given the congenital and asymptomatic nature of AVM and considering veins and clots could be affected by the AVM, petitioner's "pain's onset does not seem to depend on any 'trigger' or inciting event." *Id.* at 14–15 (citing Ex. 5 at 731–32).

Last, the Chief Special Master determined "the Kaiser orthopedist and sports medicine specialists accepted the vascular malformation as likely explaining Petitioner's symptoms" because "they did not identify any unrelated musculoskeletal injury" or any evidence implicating the vaccine directly. *Id.* at 15.

Given the Chief Special Master's finding the record contained sufficient support around the AVM diagnosis and did not contain sufficient support ruling out AVM as being the cause of petitioner's shoulder pain, the Chief Special Master determined petitioner failed to establish QAI 4, in addition to QAI 3. *Id.* at 14. "In light of Petitioner's inability to establish all QAI requirements," the Chief Special Master found petitioner "is not entitled to compensation on its basis, warranting the Table SIRVA claim's dismissal." SM Dec. at 15.

### B. The Special Master's Survey of Petitioner's Off-Table Claim

After determining petitioner's SIRVA Table claim failed, the Chief Special Master evaluated whether petitioner could establish an Off-Table injury, which requires petitioner to establish the vaccine administration was a cause-in-fact of her injuries. As a threshold matter, the Chief Special Master noted, if plaintiff was able to satisfy the three elements of the test set forth in *Althen v. Sec'y of Health & Human Services*, 418 F.3d 1274 (Fed. Cir. 2005), petitioner might be able to show a preexisting shoulder injury was exacerbated by vaccine administration. The Chief Special Master determined, however, petitioner's Off-Table claim would be time-barred because "[petitioner] did not file a Vaccine Program claim by the standard statutory deadline of thirty-six (36) months after the onset of her vaccine injury, *e.g.*, by late July 2018." SM Dec. at 15. Not only did petitioner file suit in state court (*i.e.*, the wrong venue), petitioner's state court action was also six months past the statutory deadline. *Id.* at 15–16.

## III. Parties' Arguments

On 14 August 2025, petitioner moved for review of the Special Master's Decision on Entitlement. *See* Mot. for Rev., ECF No. 55. Disputing the Chief Special Master's finding,

petitioner contends the Special Master's decision was "arbitrary, capricious, an abuse of discretion, and/or otherwise not in accordance with law, and that the findings of fact and conclusions of law were clearly erroneous."  Mot. for Rev. at 1.

Petitioner identifies four main objections to the Chief Special Master's Decision on Entitlement:  (1) failing to adequately consider petitioner's shoulder pain and symptoms of pain in other areas of the arm as unrelated separate conditions, (2) finding petitioner did not meet QAI 3 was erroneous and a mischaracterization of evidence, (3) applying the incorrect legal standard when finding petitioner did not meet the criteria for QAI 4 due to AVM being a "potential" explanation for her symptoms, and (4) failing to give deference to petitioner's treating physicians was arbitrary, capricious, or an abuse of discretion.  Mot. for Rev. at 7.

The government argues the Chief Special Master "properly considered the records as a whole, including the relevant medical records" and "thoroughly reviewed the evidence and concluded the petitioner did *not* meet her burden of proving the third and fourth QAI."  Gov't's Resp. at 5.  The government contends "petitioner did not establish that it was more likely than not that her pain and reduced range of motion were limited to the shoulder in which the vaccine was administered (QAI 3), and she did not show that it was more likely than not that no other condition or abnormality was present that would explain her symptoms (QAI 4)."  *Id.*

## IV.    Applicable Law

### A.    The Court's Standard of Review of a Special Master's Decision

The National Childhood Vaccine-Injury Compensation Act entrusts this court with reviewing a Special Master's decision upon timely motion of either party.  *See* 42 U.S.C. § 300aa-12(e)(1)–(2).  In reviewing the record of the proceedings before the Special Master, the Court may:  (1) "uphold the findings of fact and conclusions of law of the special master and sustain the special master's decision;" (2) "set aside any findings of fact or conclusion of law of the special master found to be arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law and issue its own findings of fact and conclusions of law;" or (3) "remand the petition to the special master for further action in accordance with the court's direction." *Id.* § 300aa-12(e)(2).  "Fact findings are reviewed . . . under the arbitrary and capricious standard; legal questions under the 'not in accordance with law' standard; and discretionary rulings under the abuse of discretion standard." *Saunders v. Sec'y of Health & Hum. Servs.*, 25 F.3d 1031, 1033 (Fed. Cir. 1994) (quoting *Munn v. Sec'y of Health & Hum. Servs.*, 970 F.2d 863, 870 n.10 (Fed. Cir. 1992)).

In reviewing a special master's decision, a court does not "reweigh the factual evidence[,] assess whether the special master correctly evaluated the evidence[, or] examine the probative value of the evidence or the credibility of the witnesses[—t]hese are all matters within the purview of the fact finder." *Lampe v. Sec'y of Health & Hum. Servs.*, 219 F.3d 1357, 1360 (Fed. Cir. 2000) (quoting *Munn*, 970 F.2d at 871).  "Reversal is appropriate only when the special master's decision is arbitrary, capricious, an abuse of discretion, or not in accordance with the law." *Snyder v. Sec'y of Health & Hum. Servs.*, 88 Fed. Cl. 706, 718 (2009).  The arbitrary and capricious standard "is a highly deferential standard of review:" "[i]f the special master has

considered the relevant evidence of record, drawn plausible inferences and articulated a rational basis for the decision, reversible error will be extremely difficult to demonstrate." *Hines v. Sec'y of Health & Hum. Servs*., 940 F.2d 1518, 1528 (Fed. Cir. 1991).

**B.    Qualifications and Aids to Interpretation for Shoulder Injury Related to Vaccine Administration under the Vaccine Injury Table**

"A petitioner can show causation under the Vaccine Act in one of two ways":  (1) "by showing that she sustained an injury in association with a vaccine listed in the Vaccine Injury Table[,] . . . [i]n such a case, causation is presumed"; or (2) "if the complained-of injury is not listed in the Vaccine Injury Table . . . the petitioner may seek compensation by proving causation in fact. *Broekelschen v. Sec'y of Health & Hum. Servs*., 618 F.3d 1339, 1341–42 (Fed. Cir. 2010) (internal citations omitted); *see also Knudsen v. Sec'y of Health & Hum. Servs*., 35 F.3d 543, 547 (Fed. Cir. 1994) (noting the Vaccine Act "removes the petitioner's difficult burden of proving actual causation by allowing the petitioner to rely on a table[-based] injury and a presumption of causation").  One of the recognized vaccine injuries under the Table, as of 2017, is SIRVA.  42 C.F.R. § 100.3(c)(10).  According to the Vaccine Table, "SIRVA manifests as shoulder pain and limited range of motion occurring after the administration of a vaccine intended for intramuscular administration in the upper arm.  These symptoms are thought to occur as a result of unintended injection of vaccine antigen or trauma from the needle into and around the underlying bursa of the shoulder resulting in an inflammatory reaction.  SIRVA is caused by an injury to the musculoskeletal structures of the shoulder (e.g. tendons, ligaments, bursae, etc.)[, but is not] a neurological injury."  42 C.F.R. § 100.3(c)(10).  A petitioner must manifest the following four QAIs to "be considered to have suffered SIRVA":

> (i) No history of pain, inflammation or dysfunction of the affected shoulder prior to intramuscular vaccine administration that would explain the alleged signs, symptoms, examination findings, and/or diagnostic studies occurring after vaccine injection;

> (ii) Pain occurs within the specified time-frame;

> (iii) Pain and reduced range of motion are limited to the shoulder in which the intramuscular vaccine was administered; and

> (iv) No other condition or abnormality is present that would explain the patient's symptoms (e.g. NCS/EMG or clinical evidence of radiculopathy, brachial neuritis, mononeuropathies, or any other neuropathy).

*Id*.

**V.    Review of the Special Master's Decision on Entitlement**

In its Motion for Review, petitioner identifies four main objections to the Chief Special Master's Decision on Entitlement:  (1) failing to adequately consider petitioner's shoulder pain and symptoms of pain in other areas of the arm as unrelated separate conditions; (2) finding

petitioner did not meet QAI 3 was erroneous and a mischaracterization of evidence; (3) applying the incorrect legal standard when finding petitioner did not meet the criteria for QAI 4 due to AVM being a "potential" explanation for her symptoms; and (4) failing to give deference to petitioner's treating physicians was arbitrary, capricious, or an abuse of discretion.  Mot. for Rev. at 7.  At oral argument, when prompted by the Court, petitioner agreed it raises two main objections, with the other two objections being subsumed by the main two objections:[2]  (1) "whether the record evidence shows, and whether the Chief Special Master sufficiently analyzed for the QAI 3 analysis, petitioner's chief complaint and primary pain was shoulder pain from SIRVA," Tr. at 14:5–13; and (2) "whether the Chief Special Master correctly evaluated the evolution of petitioner's treating physicians' diagnoses when analyzing QAI 4 and whether the Chief Special Master discarded those diagnoses in place of his own diagnoses," Tr. at 14:14–15:2.  *See also* Tr. at 13:20–22 ("[THE COURT: T]he fourth objection is baked into QAI 4.  [PETITIONER]:  Yes.").  To further clarify, petitioner noted QAIs 3 and 4 "work with each other and in . . . a bit of a combination[,] overlapp[ing] with the way the evidence can come together and be focused . . . in order to answer those . . . QAIs."  Tr. at 6:17–7:3; *see also* Tr. at 14:3–4 ("[PETITIONER:]  [A]t the end of the day, [QAI 3 and 4 a]re tied together, yes.").

The Court first reviews whether the Chief Special Master properly analyzed the record evidence and provided rationale for the QAI 3 analysis regarding whether petitioner's primary pain was shoulder pain from a SIRVA.  Then, the Court assesses whether the Chief Special Master discarded more recent diagnoses from petitioners' treating physicians, instead relying on older, preliminary diagnoses from the physicians and the Chief Special Master's own diagnoses, as pertinent to QAI 4.

## VI.    Whether the Chief Special Master Provided Sufficient Rationale under QAI 3

In determining whether the Chief Special Master properly analyzed the record evidence and provided rationale under QAI 3, the Court starts by reviewing the parties' arguments and the applicable legal standard.  Then, the Court inspects petitioner's medical records to assess whether petitioner's primary pain could be limited to shoulder pain and range of motion issues from SIRVA.  The Court ends with evaluating whether, in view of the record evidence and the Decision, the Chief Special Master provided sufficient rationale under QAI 3.

Petitioner argues the Chief Special Master "summarily found, in a one paragraph discussion, that Petitioner did not meet QAI 3."  Mot. for Rev. at 8.  Though petitioner *did* experience symptoms in her left arm in addition to her shoulder, petitioner contends the Chief Special Master "failed to address Petitioner's argument (and the opinions of her doctors) that

---

[2] Petitioner assented at oral argument it is not objecting to the special master's finding a non-Table (*i.e.*, causation-in-fact) version of petitioner's SIRVA claim is time-barred nor to the lack of evidentiary hearing or expert reports.  Tr. at 15:4–25 ("[THE COURT:  A]fter the analyses on page 15 through 16 of his decision, the Chief Special Master found petitioner cannot bring a non-Table causation-in-fact version of the SIRVA claim because it's time-barred.  There's no objection to that, is there?  [PETITIONER]:  No, Your Honor.  THE COURT:  So just to be clear, petitioner is not arguing any non-Table causation-in-fact version of the SIRVA claim.  [PETITIONER]:  No, Your Honor.  You know, Mrs. Chu has to meet the Table criteria . . . . THE COURT:  Also, somewhat related, petitioner did not raise any issue or objection with the Chief Special Master not seeking expert reports or conducting an evidentiary hearing.  [PETITIONER]:  I think that that is -- that is true.  That's not necessarily an objection, but I don't know that that is something that wasn't raised, that we don't have any contrary or opinion evidence.").

Petitioner suffered from two conditions:  1. SIRVA; and 2. Thoracic Outlet Syndrome related to her AVM." *Id.*  Petitioner further argues the Chief Special Master "overemphasized the AVM as the source of all of Petitioner[']s symptoms and complaints while failing to consider that the AVM was the cause for the nerve complaints throughout the arm as discussed by [her radiologist]." *Id.* at 9.  According to other SIRVA Table cases in this court, petitioner asserts "[a] Petitioner can satisfy the third QAI even if she is 'treated for other pain, elsewhere' in the body that is caused by a different condition." *Id.* (quoting *Record v. Sec. of Health & Hum. Servs.*, 175 Fed. Cl. 673, 680 (2025) (citing *Rodgers v. Sec. of Health & Hum. Servs.*, No. 18-0559V, 2021 WL 4772097, at *8 (Fed. Cl. Sept. 9, 2021))).

Given petitioner's physiatrist noted two separate diagnoses for petitioner's pain, petitioner posits the Chief Special Master misconstrued the medical records by stating Dr. Kaul concluded "the vaccination caused the left C8 pattern of symptoms . . . [because] Dr. Kaul did not endorse the left C8 pattern of symptoms." Mot. for Rev. at 9–10.  Petitioner asserts she "complained of immediate onset of pain in the left shoulder where the injection occurred in addition to associated symptoms down her arm[, and] the medical records demonstrate that the pain in her left shoulder never subsided." *Id.* at 10.  Especially considering the Chief Special Master's prior decision noted "claims involving musculoskeletal pain primarily occurring in the shoulder are valid under the Table even if there are additional allegations of pain extending to adjacent parts of the body, since the essence of the claim is that a vaccine administered to the shoulder *primarily* caused pain there," petitioner argues "[i]n concluding that Petitioner failed to satisfy the third QAI because she experienced symptoms throughout her left arm, [t]he Chief Special Master failed to use the correct legal standard under the third QAI." *Id.* at 10–11.

In response, the government argues because petitioner did not allege a cause-in-fact claim, "the matter before the Chief Special Master was not whether the petitioner's Tdap vaccination caused a shoulder injury but whether petitioner preponderantly established the requirements of a Table SIRVA claim as outlined at 42 C.F.R § 100.3(c)(10) and thus was entitled to a presumption of causation." Gov't Resp. at 5.  The government asserts, citing to a prior decision by the Chief Special Master, "the third QAI's intended purpose is to guard against compensating claims involving patterns of pain or reduced range of motion indicative of a cause beyond the confines of a musculoskeletal injury, as outlined in the Table." *Id.* at 6 (citing *Valdez v. Sec'y of Health & Hum. Servs.*, No. 21-0394V, 2024 WL 1526536 (Fed. Cl. Spec. Mstr. Feb. 28, 2024) (Corcoran, C.S.M.).  Although "pain found elsewhere in the body caused by a different condition will not automatically defeat the third QAI," the government avers "[n]onetheless, in numerous instances, the Chief Special Master has weighed the relevant evidence and concluded that other different symptoms or conditions were so intertwined that they could not reasonably be distinguished or differentiated from the alleged SIRVA." *Id.* (citing four previous special master cases, but not record evidence).  Specifically, the government argues the Chief Special Master "reasoned that petitioner suffered pain radiating down her arm and reduced range of motion in her elbow within days after the vaccination, and that petitioner thereafter consistently reported pain and other sensory symptoms throughout her left arm, and sometimes pain in her left upper back, for a period of years." *Id.* (citing SM Dec. at 12).  Given "'[a]t best, these symptoms were less constant and/or less disruptive than the primary complaint of shoulder pain and that these symptoms suggested a more complex injury not contemplated by the Table,'" the government argues "[t]he Chief Special Master drew these reasonable inferences based on the evidence and

then articulated in his Decision a reasoned explanation for his conclusion that petitioner's pain and symptoms outside her shoulder were not incidental or peripheral to her overall condition, such that they could be distinguished." *Id.* (quoting SM Dec. at 12).

As the government argues the Chief Special Master articulated a "reasoned explanation" in finding petitioner failed to satisfy QAI 3, the Court starts by reviewing the Chief Special Master's "reasoned explanation." On page 12 of the Decision, the Chief Special Master dedicated just two paragraphs to QAI 3. In the first, the Chief Special Master summarized his interpretation of QAI 3 and the purpose for the QAI. The Chief Special Master began by acknowledging petitioner is "somewhat correct . . . that this third QAI criteria . . . is not automatically defeated by evidence of *some* degree of symptoms outside of the vaccinated shoulder." SM Dec. at 12 (citations omitted).[3] Then, citing to a previous opinion concerning a SIRVA Table claim, the Chief Special Master stated, "'claims involving musculoskeletal pain primarily occurring in the shoulder are valid under the Table even if there are additional allegations of pain extending to adjacent parts of the body, since the essence of the claim is that a vaccine administered to the shoulder primarily caused pain there.'" SM Dec. at 12 (quoting *Valdez v. Sec'y of Health & Hum. Servs.*, No. 21-0394V, 2024 WL 1526536 (Fed. Cl. Spec. Mstr. Feb. 28, 2024) (Corcoran, C.S.M.) (further citing *Cross v. Sec'y of Health & Hum. Servs.*, No. 19-1958V, 2023 WL 120783, at *7 (Fed. Cl. Spec. Mstr. Dec. 2, 2022))). Continuing from the same opinion, the Chief Special Master noted two legal propositions: (1) "[d]etermining whether the pain is predominant to the shoulder, or reflects a more systemic injury, is part of the balancing of evidence performed by special masters[; and (2)] the third QAI's purpose is to 'guard against compensating claims involving patterns of pain or reduced range of motion indicative of a contributing etiology beyond the confines of a musculoskeletal injury to the affected shoulder.'" *Id.* (quoting *Valdez*, 2024 WL 1526536 (Corcoran, C.S.M.) (further citing *Grossman v. Sec'y of Health & Hum. Servs.*, No. 18-0013V, 2022 WL 779666, at *15 (Fed. Cl. Spec. Mstr. Feb. 15, 2022) (Horner, S.M.)).

---

[3] The Court recognizes the Chief Special Master found petitioner's statement about QAI 3 not being automatically defeated by the presence of injury outside of the shoulder to be "somewhat correct." SM Dec. at 12. When the Court asked the government at oral argument why the petitioner is only *somewhat* correct and what about petitioner's statement was somewhat *wrong*, the government insisted, *inter alia*, the Chief Special Master 's statement was not incorrect and stated the inverse of "somewhat correct" does not exist. Tr. at 58:8–18 ("[THE COURT]: So QAI 3, he's got two paragraphs on QAI 3 analysis and he's referring to, over here, "Petitioner is somewhat correct," the beginning of that first paragraph. The inverse of that, the somewhat wrong, would be the outcome of this case. Is that correct? [THE GOVERNMENT]: I don't agree with that statement, Your Honor. THE COURT: Then what would the inverse of that be? [THE GOVERNMENT]: I don't think there is an inverse to that statement."); Tr. at 59:6–18 ([THE COURT]: So what does it mean to say petitioner is somewhat correct that the third QAI criteria is not automatically defeated by evidence of some degree of symptoms? What is not correct? What is incorrect? [THE GOVERNMENT]: That there's a per se preclusion. THE COURT: But then that's totally correct. Is the statement not that it's totally correct? [THE GOVERNMENT]: So he uses the term "automatically defeated." To me, that speaks to whether there's a per se preclusion. There is no per se preclusion. I acknowledge that in my brief."). According to the Chief Special Master's own decisions, QAI 3 is not automatically defeated by the presence of an injury outside of the shoulder—in other words, there is no per se preclusion if a petitioner exhibits symptoms outside of the shoulder, as the government repeatedly mentioned at oral argument. *See id.* This means, petitioner is not merely *somewhat* correct; petitioner is *fully* correct, which the government was unwilling to admit at oral argument, despite agreeing with the underlying legal standard in its brief.

In the second paragraph, the Chief Special Master decided the "record in this case, however, does not support the conclusion that pain outside of the vaccinated shoulder was incidental or peripheral to Petitioner's overall condition, such that it could reasonably be distinguished." *Id.* Instead, according to the Chief Special Master, the record evidence "shows that Petitioner suffered pain radiating down the arm, and reduced range of motion *in her elbow*, within days after her vaccination[, and] continued to suffer pain and other sensory symptoms throughout her left arm, and sometimes pain in her left upper back and neck, for years." SM Dec. at 12 (emphasis in original). In support of this statement, the Chief Special Master inserted a string *see, e.g.*, cite: "*See, e.g.*, Ex. 5 at 17, 44, 47, 258 – 59, 283, 302 – 03, 309, 319, 347, 731, 404, 546, 652, 695, 731; Ex. 20 at 1; Ex. 21 at 18." SM Dec. at 12. According to the Chief Special Master, "these symptoms were less constant and/or less disruptive than the primary complaint of shoulder pain[, b]ut the non-shoulder symptoms also suggest a more complex injury of a kind not contemplated by the Table SIRVA listing." *Id.* Then, to support this conclusion, the Chief Special Master cited to petitioner's medical record where her radiologist found the vaccination caused both a SIRVA and a left C8 pattern of symptoms. *Id.* (citing 3 June 2019 Dr. Kaul Office Visit, Ex. 5 at 652).

A special master's conclusion survives review when the special master's analysis "reflects a careful review of the record evidence" accompanied with a reasoned assessment of the evidence. *White v. Sec'y of Health & Hum. Servs.*, No. 24-1372, 2025 WL 3703259, at *6 (Fed. Cir. Aug. 27, 2025), *reissued* Dec. 22, 2025; *Paluck v. Sec'y of Health & Hum. Servs.*, 786 F.3d 1373, 1380 (Fed. Cir. 2015) ("While review of the factual findings made by a special master is highly deferential, both the Court of Appeals for the Federal Circuit and the Court of Federal Claims have a duty to ensure that the special master has properly applied Vaccine Act evidentiary standards, 'considered the relevant evidence of record, drawn plausible inferences and articulated a rational basis for the decision.'" (cleaned up)); *see also id.* at *2 (noting the Federal Circuit "appl[ies] the same standard that [the Court of Federal Claims] applies in reviewing the decision of the special master" (citing *Moberly v. Sec'y of Health & Hum. Servs.*, 592 F.3d 1315, 1321 (Fed. Cir. 2010))). The special master must also provide an explanation sufficient to allow the reviewing court to discern "whether [the special master] followed a proper path" and whether the medical records provide a reasonable basis for the special master's conclusions. *Stratton v. Sec'y of Health & Hum. Servs.*, 138 F.4th 1368, 1372 (Fed. Cir. 2025) (quoting *Alacritech, Inc. v. Intel Corp.*, 966 F.3d 1367, 1371 (Fed. Cir. 2020)). "A naked conclusion and mere recitation that the opinion is based upon all of the evidence without an analysis of the evidence in writing is inimical to a rational system of administrative determination and ultimately inadequate." *Istivan v. United States*, 689 F.2d 1034, 1038–39 (Ct. Cl. 1982) (quoting *Beckham v. United States*, 183 Ct. Cl. 628, 392 F.2d 619 (1968)) (ellipses removed).

The Court first reviews whether the Chief Special Master properly articulated a rational basis to decide the record evidence does "not support the conclusion that pain outside of the vaccinated shoulder was incidental or peripheral to Petitioner's overall condition," then assesses whether the Chief Special Master considered relevant evidence and articulated a rational basis in view of the string citation to medical records under QAI 3.

**A.** **Whether Chief Special Master Articulated Rational Basis To Find Pain Outside the Shoulder Was Incidental or Peripheral**

The Court evaluates whether the Chief Special Master considered the relevant evidence and articulated a rational basis to support his conclusion regarding QAI 3. QAI 3 asks whether "[p]ain and reduced range of motion are limited to the shoulder in which the intramuscular vaccine was administered." 42 C.F.R. § 100.3(c)(10). While the first sentence of the second paragraph of the Chief Special Master's QAI 3 discussion notes his inability to reasonably distinguish whether pain outside the shoulder was incidental or peripheral to petitioner's condition, the penultimate sentence of the discussion is accompanied with a citation to the medical record identifying *two separate etiologies* causing petitioner's pain. *See* SM Dec. at 12 ("[T]he non-shoulder symptoms also suggest a more complex injury of a kind not contemplated by the Table SIRVA listing. *See* Ex. 5 at 652 (physiatrist's endorsement that Petitioner's vaccination had caused 1) SIRVA and 2) a left C8 pattern of symptoms, both beginning within 48 hours).").[4] In the physician's written assessment, he described two sets of symptoms. First—regarding "left shoulder pain [that] started 4 years ago[,] immediately after vaccination—the physician noted:

> That pain is anterior and posterior shoulder worse with using shoulder, moving shoulder; she has significant limitation in left shoulder ROM. She was found to have cyst which was surgically targeted, then found to have AVM at the same site, anterior to glenohumeral joint - which has been targeted twice with sclerotherapy. She has adhesive capsulitis on examination today.

3 June 2019 Dr. Kaul Office Visit, Ex. 5 at 652. The physician, here, expressly noted the left shoulder pain was related to a "significant limitation in left shoulder ROM," and diagnosed her with adhesive capsulitis on that specific visit. *Id.* For the second set of symptoms, the physician noted:

> left C8 pattern of symptom(s) . . . started within a day of the above symptom(s). In addition to the interventional treatments above, she's had extensive conservative

---

[4] The Court notes the paradoxical nature of the government's arguments. The Chief Special Master found, and the government argues, petitioner's medical records do not sufficiently support a Table SIRVA claim. *See, e.g.*, Gov't's Resp. at 5, 15, 16. Concurrently and conversely, when petitioner pointed to evidence her physicians diagnosed her with SIRVA—the basis of her Table claim—the government contends "there is no such thing as 'SIRVA' outside the Vaccine Injury Table" because "SIRVA itself is not a medically recognized injury . . . it is a 'medicolegal term.'" Gov't's Resp. at 15 n.8; *see also* Tr. at 81:1, 11–13 ("SIRVA is not a diagnosis . . . it would be more proper to diagnose bursitis or tendinosis, an injury."). Petitioner responded at oral argument "there is medical literature that mentions SIRVA[, and] it's permeated into the medical world." Tr. at 82:14–83:9*; see generally* Michael Shahbaz, *et al.*, *Shoulder Injury Related to Vaccine Administration (SIRVA): An Occupational Case Report*, 67 Workplace Health & Safety 501, 501–05 (2019) ("We report a case of a health care worker who was diagnosed with SIRVA soon after receiving an influenza vaccination as part of a mandated workplace seasonal influenza campaign."); Chelsey T Wood & Asif M Ilyas, *Shoulder Injury Related to Vaccine Administration: Diagnosis and Management*, 4 J. of Hand Surgery Global Online 111, 112 (2022) ("Most vaccine injection–related shoulder complaints are self-limited and resolve within 24 to 48 hours. A small subset of patients go on to experience prolonged and debilitating shoulder pain, often diagnosed as SIRVA.") (footnote omitted).

treatment.  She recently saw the Pain Service who referred her here for rule out CRPS.  Her symptom(s) are C8 pattern is constant pain, worse with petting pet with elbow at trunk and internal rotation/ external rotation.  She has temperature and color changes and allodynia left arm and left shoulder girdle.

*Id.*  There is no mention of shoulder range of motion issues related to the left C8 pattern of symptoms—the physician instead notes:  (1) constant pain in elbow, (2) issues of internal and external rotation (which is the motion used when throwing a frisbee, for example), (3) temperature and color changes, and (4) allodynia in her left arm and left shoulder girdle (which is pain from generally non-painful contact such as clothing and a light breeze).  After the physician's "examination/review of imaging/and review of case," the physician concluded: petitioner "appears to have *two* separate pain generators.  One is the shoulder and appears to be (SIRVA) shoulder injury related to vaccine administration. . . .  The other appears to be a thoracic outlet syndrome / C8 pattern of symptom(s)."  *Id.* (emphasis in original).

In his Decision, the Chief Special Master noted QAI 3 "is not automatically defeated by evidence of some degree of symptoms outside of the vaccinated shoulder," but then concluded:

> At best, these symptoms were less constant and/or less disruptive than the primary complaint of shoulder pain.  But the non-shoulder symptoms also suggest a more complex injury of a kind not contemplated by the Table SIRVA listing.

SM Dec. at 12.  The Chief Special Master's conclusion effectively rules out a petitioner's entitlement to a SIRVA Table claim if the petitioner suffered "symptoms outside of the vaccinated shoulder"—but the QAIs and its preamble do not support this rigid interpretation of QAI 3.  The preamble to the QAIs expressly contemplates "symptoms . . . *in[] and around the underlying bursa of the shoulder resulting in an inflammatory reaction*[, and] caused by an injury to the musculoskeletal structures of the shoulder (*e.g.*[,] tendons, ligaments, bursae, etc.)." 42 C.F.R. § 100.3.  Moreover, when the Department of Health and Human Services sought to add SIRVA to the Vaccine Table, the Department clarified pain in the neck or back *without an injury to the shoulder* would not constitute SIRVA under QAI 3—but did *not* state pain in the neck or back precludes a finding of SIRVA if injury to the shoulder *is* present.  *See* 82 Fed. Reg. 6294, 6296 (Jan. 19, 2017).  Further, both parties' briefing agreed non-shoulder symptoms do not automatically defeat a finding of SIRVA.  *See* Mot. for Rev. at 10; Gov't's Resp. at 10.  When the Court sought to understand the basics of a shoulder injury contemplated by SIRVA, however, the government disputed even rudimentary human anatomy:

> [THE COURT:]  [I]f you were to move your shoulder, you agree that your elbow and your arm also move, correct?
> [THE GOVERNMENT]:  No.
> [THE COURT:]  No?
> [THE GOVERNMENT]:  No.
>                       . . . .
> [THE COURT:]  My six-year-old likes to sing a song, especially at Halloween[:]
>
> The finger bone's connected to the hand bone,

> The hand bone's connected to the arm bone,
> *The arm bone's connected to the shoulder bone,*
> Now shake dem skeleton bones!

> [THE GOVERNMENT]:  Mm-hmm.
> [THE COURT:]  You agree with all that?
> [THE GOVERNMENT]:    Well, I agree that's a song that kids sing at Halloween . . . . [T]he pain and symptoms are what we're trying to address here, whether they occur in the shoulder or outside the shoulder.

Tr. at 67:18–70:20[5] (emphasis added).  With greater understanding of grade school anatomy basics, petitioner noted the fundamentals of shoulder connection to the rest of the body:  "records [here] . . . show the pain radiated outside of the shoulder . . . [a]nd *Valdez* itself is [a case] where the petitioner argued that HHS did not intend to preclude compensation for valid SIRVA claims if the shoulder pain radiated."  Tr. at 71:16–25; *see also Valdez v. Sec'y of Health & Hum. Servs.*, No. 21-0394V, 2024 WL 1526536, at *1, *6 (Fed. Cl. Spec. Mstr. Feb. 28, 2024) (Corcoran, C.S.M.) ("[T]he fact that a claimant reports some radiating pain does not completely invalidate a Table SIRVA."); *Cross v. Sec'y of Health & Hum. Servs.*, No. 19-1958V, 2023 WL 120783, at *7 (Fed. Cl. Spec. Mstr. Dec. 2, 2022) (Corcoran, C.S.M.) ("[C]laims involving musculoskeletal pain primarily occurring in the shoulder are valid under the Table even if there are additional allegations of pain extending to adjacent parts of the body, since the essence of the claim is that a vaccine administered *to* the shoulder *primarily* caused pain there.") (emphasis in original); *Rodgers v. Sec'y of Health & Hum. Servs.*, No. 18-0559V, 2021 WL 4772097, at *8 (Fed. Cl. Spec. Mstr. Sept. 9, 2021) (Corcoran, C.S.M.) (QAI 3 "does not prevent a petitioner with simultaneous areas of pain due to unrelated conditions from also meeting the Table SIRVA definition.").  Considering the QAI preamble, the Department's response to public comment, the parties' agreement, and the Chief Special Master's own prior decisions allow for non-shoulder symptoms in SIRVA Table claims, the mere presence of non-shoulder symptoms does not foreclose petitioner's ability to satisfy QAI 3 where injury to the shoulder is present.  Beyond one conclusory statement, "non-shoulder symptoms . . . suggest a more complex injury," the Chief Special Master did not articulate a rational basis for why non-shoulder symptoms preclude a finding of SIRVA in this case.  *See* SM Dec. at 12.  Accordingly, the Chief Special Master's conclusion petitioner's shoulder injury was "not contemplated by the Table SIRVA listing"— merely because petitioner suffered other non-shoulder symptoms—is arbitrary and capricious, and contrary to law.  42 U.S.C. § 300aa-12(e)(1)–(2); *Paluck v. Sec'y of Health & Hum. Servs.*, 786 F.3d 1373, 1380 (Fed. Cir. 2015) ("While review of the factual findings made by a special

---

[5] The Court also asked the government whether petitioner's injuries explicitly listed in a PT record under "musculoskeletal" detailing left shoulder tenderness were related to the musculoskeletal structure of the system—the government said "No."  *Compare* Tr. at 94:11–16 ("[THE COURT]:  Given that the humerus bone is the bone . . . connecting the shoulder to the elbow, according to my 8th grade skeleton [song] that we looked at, this description is then related to the musculoskeletal structure of the shoulder, correct?  [THE GOVERNMENT]:  No.") *with* 30 July 2015 MPAS Notes, Ex. 5 at 17 (noting, under the "Musculoskeletal" section of the "Physical exam," "Left shoulder has tenderness over subacromial bursa, deltoid.  Tenderness noted at left lateral epicondyle.  Tinel positive at left elbow, negative at wrist.  Left shoulder has abduction limited to shoulder height, limited internal rotation compared to right").  Just as with the question asked at oral argument regarding rudimentary anatomy, the government also did not agree the records noting results of a PT's physical examination supported petitioner's shoulder symptoms.

master is highly deferential, both the Court of Appeals for the Federal Circuit and the Court of Federal Claims have a duty to ensure that the special master has properly applied Vaccine Act evidentiary standards, 'considered the relevant evidence of record, drawn plausible inferences and articulated a rational basis for the decision.'" (cleaned up)).

A plain reading of the physician's medical record also belies the Chief Special Master's finding and the government's proposition petitioner's pain and symptoms outside her shoulder "could not reasonably be distinguished":  the physician not only distinguished between the two sets of symptoms, but he also diagnosed petitioner with two *separate* pain generators.  *Compare* Gov't's Resp. at 10–11 (emphasis added) *with* 3 June 2019 Dr. Kaul Office Visit, Ex. 5 at 652 (noting petitioner "appears to have two separate pain generators.  One is the shoulder and appears to be (SIRVA) shoulder injury related to vaccine administration. . . . The other appears to be a thoracic outlet syndrome / C8 pattern of symptom(s).").  Though both the Chief Special Master (and the government) concede some symptoms outside the vaccinated shoulder do not preclude entitlement under a SIRVA Table Claim, the Chief Special Master did not address whether petitioner could have suffered SIRVA—as the physician diagnosed—constituting an injury expressly contemplated by the Table SIRVA injury while *also* suffering from a separate and independent left C8 pattern of symptoms (which could potentially require, for example, a causation-in-fact analysis for an off-Table claim).  When pressed at oral argument to "read to [the Court] where, for QAI 3, the Chief Special Master distinguished between this lack of separation between SIRVA and C8," the government narrated:  (1) a sentence about a special master's role under QAI 3 to guard against compensating claims involving etiologies beyond the confines of a musculoskeletal injury; and (2) another sentence "in his analysis, [where] he says, 'At best, these symptoms were less constant or less disruptive.'"  Tr. at 86:12–88:10.

Accordingly, the Chief Special Master erred in two ways:  (1) the Chief Special Master summarily stated pain outside of the vaccinated shoulder could not be reasonably distinguished despite Dr. Kaul differentiating between shoulder pain from SIRVA and non-shoulder pain from the C8 pattern of symptoms; and (2) in concluding petitioner failed to establish QAI 3 because her "symptoms also suggest a more complex injury of a kind not contemplated by the Table," the Chief Special Master did not articulate a rational basis explaining what injury *is* contemplated by the Table and how the distinction drawn by the physician between SIRVA and C8 pattern of symptoms would fail to satisfy an injury of a kind contemplated by the Table.  As the Chief Special Master and the government concede separate and independent etiologies do not preclude satisfaction of QAI 3, and because the medical record the Chief Special Master cites in the Decision describes two separate pain generators distinguishing between her symptoms from SIRVA and her neuropathy, the Chief Special Master did not "articulate[] a rational basis for the decision" regarding the two separate pain generators not satisfying QAI 3.  42 U.S.C. § 300aa-12(e)(2) (permitting this court to set aside a special master's factual findings or legal conclusions in place of the court's own; or remand to the special master for further action); *Stratton*, 138 F.4th at 1372 ("Given the failure to explain why the evidence in the record was sufficient to provide a reasonable basis for [petitioner's] claim, the Chief Special Master's decision is inadequate for appellate review."); *Istivan*, 689 F.2d at 1038–39 ("'A naked conclusion and mere recitation that the opinion is based upon all of the evidence without an analysis of the evidence in writing is inimical to a rational system of administrative determination and ultimately inadequate.'" (quoting *Beckham*, 392 F.2d at 622–23); *Paluck*, 786 F.3d at 1380; *Snyder*, 88 Fed.

Cl. at 718 ("Reversal is appropriate only when the special master's decision is arbitrary, capricious, an abuse of discretion, or not in accordance with the law.") (footnote omitted).  To be clear, the Court is not making a factual finding as to whether petitioner satisfied QAI 3.  *See Stratton*, 138 F.4th at 1373 ("To be clear, we express no opinion on whether the Chief Special Master's decision was correct or incorrect.").

> **B.      Whether the Chief Special Master's String Citation to Record Evidence is Sufficient to Show Rational Basis**

The Chief Special Master relies on seventeen exhibits in a string cite for the proposition petitioner suffered pain in her arm, elbow, upper back, and neck—but also uses these seventeen exhibits to state "at best, these symptoms were less constant and/or less disruptive than the primary complaint of shoulder pain."  SM Dec. at 12.  Having determined in Section VI.A, *supra*, the Chief Special Master could have distinguished the symptoms based on the medical records, the Court now reviews some of cited exhibits to determine whether the Chief Special Master considered all relevant record evidence and articulated a rational basis in support of his conclusion petitioner's pain was not limited to the shoulder.

As a first example, page 17 of Exhibit 5 includes notes from a Physical Exam of petitioner by a physician's assistant.  30 July 2015 MPAS Notes, Ex. 5 at 17.  In the notes, under the section labeled "Musculoskeletal," the physician's assistant listed numerous issues related to petitioner's shoulder:

> Musculoskeletal: She exhibits no edema.
> Left shoulder has tenderness over subacromial bursa, deltoid.  Tenderness noted at left lateral epicondyle.  Tinel positive at left elbow, negative at wrist.  Left shoulder has abduction limited to shoulder height, limited internal rotation compared to right.  Left elbow extension mildly limited compared to right due to discomfort.  Passively shoulder abduction and elbow extension are only minimally limited due to discomfort.  Grip strength equal bilaterally

Ex. 5 at 17 (emphasis omitted).  Under the "Assessment" section of the notes, the physician's assistant notated (1) "Left Shoulder Pain"; (2) "Ulnar nerve injury, left, initial encounter"; and (3) "Post-vaccination reaction, initial encounter."  *Id.*  When the Court asked the government how this citation indicates shoulder injury was not the primary complaint, the government identifies the second assessment (ulnar nerve injury), but does not mention the first assessment of "left shoulder pain" or the notes describing the musculoskeletal issues.  *See* Tr. at 99:1–100:12.

The next document the Chief Special Master cited, Ex. 5 at 44, is a physical therapy initial questionnaire completed by petitioner on 24 August 2015.  In response to a prompt stating "Please describe how you were injured," petitioner noted "TDAP injection placed too high, towards joint.  Pain in shoulder for over 1 month."  24 August 2015 Physical Therapy Initial Questionnaire, Ex. 5 at 44.  The government stressed at oral argument, however, looking at the diagram underneath the prompt, petitioner circled not only her shoulder, but also her elbow and hands:



*Id.*; *see* Tr. at 112:1–9.  According to the government, "[petitioner's pain] was clearly not limited to her shoulder, and she clearly circled . . . her left hand, her back, her trapezius, and, to me, it looks like she's also circled her bicep and both back and front of her bicep."  Tr. at 112:16–20. The Chief Special Master's citation to this record has little impact on the QAI 3 analysis for two reasons.  First, this medical record is a subjective reporting of petitioner's pain—not a medical diagnosis.  *See* 24 August 2015 Physical Therapy Initial Questionnaire, Ex. 5 at 44.  Second, even if petitioner's subjective impression were relevant, petitioner describes her shoulder pain in the injury section in the written area—the Chief Special Master did not analyze whether the notation of shoulder pain or the annotated image satisfies QAI 3, notwithstanding any elbow or other potentially incidental or peripheral conditions.  *Id.*

  The Chief Special Master's next citation was to Ex. 5 at 47, which is the third page of the Doctor of Physical Therapy's "Initial Evaluation."  24 August 2015 Rebound Orthopedics PT Initial Eval., Ex. 5 at 47.  Looking at the first page of the Initial Evaluation—which the Chief Special Master did not cite in the QAI 3 analysis—the Doctor of Physical Therapy notes two medical diagnoses and three treating diagnoses:

| MEDICAL DIAGNOSIS: | 719.41 | Pain in shoulder |
| | 955.2 | Injury of ulna nerve |
| | | |
| TREATING DIAGNOSIS: | 719.61 | Other symptoms referable to joint of shoulder region |
| | 719.41 | Pain in joint involving shoulder region |
| | 719.51 | Stiffness of joint, not elsewhere classified, involving shoulder region |

24 August 2015 Rebound Orthopedics PT Initial Eval., Ex. 5 at 45.  A few notations later, the Doctor of Physical Therapy notes the "Body Part / Injury" for the visit was "Left shoulder/arm." *Id.*  At the next two physical therapy sessions (31 August and 9 September 2015), the Doctor of Physical Therapy noted the same diagnoses and injury.  31 August 2015 & 9 September 2015 Rebound Orthopedics PT Daily Notes, Ex. 5 at 53–55.  At oral argument, the government contended these medical records are "evidence of pain and reduced range of motion . . . indicative of a contributing etiology that's outside the confines of a musculoskeletal injury."  Tr. at 115:21–116:11.  Though the Chief Special Master cited to some (not all) of these records, the

Chief Special Master did not explain with any level of detail how the medical records, as the government proposes, "indicat[e] a contributing etiology that's outside the confines of a musculoskeletal injury." *Id.*; *see* SM Dec. at 12. Further, neither the Chief Special Master nor the government at oral argument explained why four of five diagnoses pertaining to shoulder injury would not suffice to show petitioner's primary pain was shoulder related. Both the Chief Special Master and the government appear to rely on the "ulna nerve" injury as destroying the possibility of establishing QAI 3, but both *also* agree QAI 3 is "not automatically defeated by evidence of some degree of symptoms outside of the vaccinated shoulder." SM Dec. at 12; Gov't Resp. at 6. Accordingly, given the Chief Special Master did not articulate a rational basis as to why the majority of diagnoses being linked to petitioner's shoulder (in view of a potential ulna nerve injury) defeated her ability to establish QAI 3, the Court remands to the Chief Special Master for consideration and articulation of a rational basis. *Paluck v. Sec'y of Health & Hum. Servs.*, 786 F.3d 1373, 1380 (Fed. Cir. 2015).

As another example, at oral argument, the government noted Exhibit 5 at 283 is "a pretty critical record" "because it's an MRI impression[, stating] no rotator cuff tear[, and] it's the first analysis of this ganglion cyst, which seems to be what most of the treaters thought was causing petitioner's symptoms." Tr. at 118:21–119:3. The government argued this record is "a critical fact for the [QAI 3] analysis" because "what the vascular abnormality specialists concluded was that the cyst was essentially pinching nerves and causing the pain, causing a nervous system disorder, [which is] not a musculoskeletal injury[, but rather] evidence of a nonmusculoskeletal injury." Tr. at 120:1–14. Further, given QAI 3 requires pain and reduced range motion to be limited to the shoulder, the government posits "a nerve injury [is] a situation where [pain is] not going to be localized to the shoulder." Tr. at 120:15–20. The Court acknowledges the government's post hoc rationalization at oral argument could be "a potential explanation" for petitioner's pain—but the Chief Special Master, in his QAI 3 analysis, did not mention an MRI, cyst, or how the MRI identified a cyst which could cause petitioner's pain, disqualifying her from satisfying QAI 3. *See* Tr. at 120:11–122:11. When asked where the Chief Special Master provided this potential explanation for petitioner's pain, the government submitted "I would point to the fact that he cited to this MRI[ and] he outlined the law or what comes from *Grossman* . . . . [he also refers] to Dr. Kaul's conclusion that the C8 pattern of symptoms was present. So collectively, those all point to that proposition by any reasonable interpretation." Tr. at 121:18–122:11. While the government's argument may explain why petitioner could ultimately fail to establish QAI 3, the Chief Special Master's decision did not include any level of detail analyzing the MRI, the cyst, the relationship between the cyst and petitioner's pain, and an assessment comparing the MRIs with the treating physicians' later diagnosis differentiating between a SIRVA and nerve injury.

Considering a special master's conclusion must "reflect[] a careful review of the record evidence" accompanied with a reasoned assessment of the evidence, the Court next inspects Federal Circuit precedent to determine what constitutes a "reasoned assessment." *White*, 2025 WL 3703259, at *6. In *Stratton v. Secretary of Health and Human Services*, the Federal Circuit found "[t]he Chief Special Master's decision essentially provides only one sentence of analysis," which "failed to explain why the medical records provided a reasonable basis" for his conclusions, and as a result, the Federal Circuit vacated and remanded to the Chief Special Master because '[it] cannot reasonably discern whether [the Chief Special Master] followed a

proper path' in rejecting these concerns and determining that [petitioner] had a reasonable basis for her petition." 138 F.4th 1368, 1372 (Fed. Cir. 2025) (quoting *Alacritech, Inc. v. Intel Corp.*, 966 F.3d 1367, 1371 (Fed. Cir. 2020)). By contrast, in *White*, the Federal Circuit found the Chief Special Master conducted a reasoned assessment of the evidence and provided a reasoned analysis in "f[inding] that '[t]he medical records establish that the infection (which first manifested 10 days before [White's] neurologic symptoms on December 10, 2017) occurred far closer in time than vaccination—but within a timeframe that would be reasonable for an antibody-driven, adaptive immune system autoimmune process to occur.'" *White*, 2025 WL 3703259, at *5 (citing *White v. Sec'y of Health & Hum. Servs.*, No. 20-1319V, 2023 WL 4204568, at *17 (Fed. Cl. June 2, 2023) (Corcoran, C.S.M.) ("*White* SM Dec."). There, given the Chief Special Master reviewed the evidence and expert reports and explained the course of injury as related to the flu vaccine's causality to the autoimmune disorder the petitioner developed, the Federal Circuit found the special master's conclusion was not arbitrary and capricious because it "will not second guess the special master's reasoned assessment of the evidence and expert reports." *See White*, 2025 WL 3703259, at *5–6; *see also White*, No. 20-1319V (Fed. Cl.), SM Dec. at *6–7, 18–19, ECF No. 35; *McClendon v. Sec'y of Health & Hum. Servs.*, 23 Cl. Ct. 191, 196 (1991) (noting "[factual] findings [for Table injury claims] must be *specific*[] and . . . *must pointedly* reference the evidence relied on to show that the existence or, as the case may be, the absence of each required element is more probable than not."); *Goodwin v. Sec'y of Health & Hum. Servs.*, No. 19-503, 2024 WL 4758470, at *3 (Fed. Cl. Oct. 10, 2024) (quoting *Motor Vehicle Mfrs. Ass'n v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 43 (1983)) ("The special master's decision does not demonstrate that his conclusions were the product of reasoned decision making as his decision does not provide enough reasoning to show the Court that he examined the relevant data, and he did not articulate a satisfactory explanation for his action including a rational connection between the facts found and the choice made.") (cleaned up); *Record v. Sec'y of Health & Hum. Servs.*, 175 Fed. Cl. 673, 680 (2025) ("Where a special master's decision does not articulate an explanation that logically connects specific facts to the terms of the Table, there is not enough for this Court's review, and remand is appropriate.").

The Chief Special Master's assessment of QAI 3, here, is akin to *Stratton*. The QAI 3 assessment consisted of a first paragraph with no analysis and a second paragraph with conclusory sentences and only *three* sentences connecting record evidence to the legal standard—one of which relied on a string "*see, e.g.*" citation. *See* SM Dec. at 12. The assessment also did not cite all relevant evidence nor attempt to articulate how the citations supported the conclusion that petitioner's symptoms were limited to the shoulder. Although there is presumption the Chief Special Master reviewed the record (as the government noted at oral argument), the Chief Special Master did not explain the citations to record evidence or provide a reasoned assessment of the record evidence in support of the conclusions to allow for the Court's review. *See McClendon*, 23 Cl. Ct. at 196; *Goodwin*, 2024 WL 4758470, at *3; *Record*, 175 Fed. Cl. at 680. For reasons analogous to the Federal Circuit's opinion in *Stratton*, considering the Chief Special Master did not articulate rational basis as to why the medical records describing shoulder pain did not satisfy QAI 3 (apart from a string citation) and did not provide a reasoned assessment, nor demonstrate consideration of all relevant evidence—as mandated by Federal Circuit precedent—the Chief Special Master acted arbitrarily and capriciously and contravened the law. *Stratton*, 138 F.4th at 1372; *Paluck v. Sec'y of Health &*

*Hum. Servs.*, 786 F.3d 1373, 1380 (Fed. Cir. 2015); *White*, 2025 WL 3703259, at *6. To be clear (and further analogous to the Federal Circuit's notation in *Stratton*), the Court does not opine on the petitioner's medical records or determine whether petitioner meets or does not meet QAI 3—the Court remands to the Chief Special Master to consider the relevant evidence, make plausible inferences, and articulate a rational basis for his conclusions with a reasoned explanation for his factual findings. *Id.*; *Stratton*, 138 F.4th at 1372, n.3 ("To be clear, we express no opinion on whether the Chief Special Master's decision was correct or incorrect."); *White*, 2025 WL 3703259, at *6.

## VII.    Whether Chief Special Master Attempted to Diagnose Petitioner Notwithstanding the Opinions of Medical Professionals

The Court next assesses whether the Chief Special Master, under QAI 4, discarded more recent diagnoses from petitioners' treating physicians and instead relied on older, preliminary diagnoses from physicians and his own diagnoses. In doing so, the Court first reviews the parties' arguments, the applicable legal standard, and the evolution of treating physicians' diagnoses from 2019 to 2023. Then, the Court analyzes whether the Chief Special Master articulated rational basis for relying on old diagnoses from petitioners' treating physicians before iterations of tests and procedures as well as the Chief Special Master's own diagnoses, instead of diagnoses later in the course of petitioner's injury.

Petitioner argues the Chief Special Master erred by (1) "applying an incorrect legal standard in determining that Petitioner did not meet the requirements of QAI 4 by a preponderance of the evidence in concluding that the AVM was a 'potential' alternate cause of her symptoms," Mot. for Rev. at 11–12; and (2) "failing to give deference to Petitioner's treating providers," *see id.* at 14. First, petitioner contends her medical records displayed a "prolonged and difficult medical journey that began the day Petitioner was vaccinated." *Id.* at 11. During her treatment, although physicians discovered congenital AVM in her shoulder which was previously asymptomatic, petitioner asserts "physicians ruled out the AVM as the source of her left shoulder pain and reduced range of motion and diagnosed her to have sustained a SIRVA injury as a result of the vaccination she received on July 21, 2015." *Id.* (citing 3 June 2019 Dr. Kaul Office Visit, Ex. 5 at 652; 27 August 2019 OHSU Office Visit in Interventional Radiology, Ex. 5 at 803). Petitioner argues the Chief Special Master does not identify any "competing medical opinions to conclude [petitioner's] treating physician[]s [were] wrong in their assessment that the AVM was not the cause of her left shoulder pain and reduced range of motion." *Id.* at 12. Moreover, petitioner argues, because treatment for the asymptomatic AVM "failed to reduce the pain and limited range of motion in her shoulder," "based upon a preponderance of the evidence, the vaccination of July 21, 2015 is the cause of Petitioner's longstanding pain and limited range of motion of her left shoulder." *Id.* Petitioner also argues the Chief Special Master found the AVM only "*potentially* explain[ed] Petitioner's injury," and because, according to a prior opinion from this court, a "finding that an alternative explanation for Petitioner's condition is *possible* does not respond to the terms of the QAI and thus cannot be enough to find that the Table criteria are unmet," the Chief Special Master applied an incorrect legal standard. Mot. for Rev. at 11 (citing *Record v. Sec'y of Health & Hum. Servs.*, 175 Fed. Cl. 673, 680 (2025)).

Second, petitioner contends the Chief Special Master failed to defer to the treating physicians' diagnoses and "substituted his opinions for the opinions of Petitioner's expert medical providers" in finding AVM (rather than the vaccine) was the potential source of petitioner's injury. *See id.* at 12–14. As one example, petitioner identifies "Dr. Matthew Kaul at Kaiser . . . diagnosed [petitioner] with []SIRVA[] and separately, possible thoracic outlet syndrome" on 3 June 2019. *Id.* at 12 (citing 3 June 2019 Dr. Kaul Office Visit, Ex. 5 at 652). As a second example, petitioner states Dr. Kaufman, a vascular specialist, "ruled out the AVM as the cause of her left shoulder pain" on 27 August 2019 because "two embolization procedures failed to reduce or alleviate Petitioner's symptoms." *Id.* at 13. Petitioner proposes "[t]he Chief Special Master discounted these opinions because they appeared to be influenced by the temporal relationship between the vaccination and the onset of left shoulder pain," despite the record evidence containing "four years of treatment and the ruling out of various conditions, including the previously a-symptomatic AVM, and the fact that petitioner experienced these symptoms within a day of the vaccination." *Id.* at 12 (first citing SM Dec. at 14; then citing 30 July 2015 MPAS Notes, Ex. 5 at 15). Petitioner also highlights the Chief Special Master "g[ave] greater weight to the Orthopedist that Petitioner saw in 2016" despite the fact the Orthopedist's opinion was written "before [petitioner] saw the vascular specialist and before the embolizations failed to produce results." *Id.* at 13–14 (first citing SM Dec at 15; then citing Ex. 5 at 338–40, 343–44, 597). Petitioner concludes the Federal Circuit mandates special masters to heed treating physicians' diagnoses and statements. Mot. for Rev. at 14; *see also Paluck v. Sec'y of Health & Hum. Servs.*, 786 F.3d 1373, 1385 (Fed. Cir. 2015) (holding a "special master erred in disregarding contemporaneous statements from [a petitioner's] treating physicians regarding the cause of his [injury]"); *Andreu v. Sec'y of Health & Hum. Servs.*, 569 F.3d 1367, 1375 (Fed. Cir. 2009) (explaining "treating physicians are likely to be in the best position to determine whether a logical sequence of cause and effect show[s] that the vaccination was the reason for the injury.").

The government argues "the Chief Special Master clearly articulated that QAI 4 places an affirmative burden on petitioner to show that the evidence of an alternative condition is not meaningful," Gov't Resp. at 13 (citing *Durham v. Sec'y of Health & Hum. Servs.*, No. 17-1899, 2023 WL 3196229, at *14 (Fed. Cl. Spec. Mstr. May 2, 2023)), and "that [the government] is not required to show an alternative cause, but merely that the record contains sufficient evidence of a competing explanation to 'muddy a plausible explanation that vaccine administration was the cause,'" *id.* (citing *French v. Sec'y of Health & Hum. Servs.*, No. 20-9862, 2023 WL 7128178, at *6 (Fed. Cl. Spec. Mstr. Sept. 11, 2023). The government asserts the Chief Special Master "considered numerous records, all of which give ample support for petitioner's AVM diagnosis as the culprit for her symptoms, thus providing a meaningful competing explanation," and noted orthopedists and sports medicine specialists did not identify or implicate any unrelated musculoskeletal injury." *Id.* at 13–14 (citing SM Dec. at 13–15). Despite acknowledging certain treating physicians did not embrace the AVM diagnosis, the government maintains the Chief Special Master "weighed the evidence and articulated a rational basis for concluding that petitioner's post-vaccination symptoms could, in part, be explained by the AVM." *Id.* at 14; SM Dec. at 11, 14 (stating "that the record evidence did not sufficiently support the radiologist's discounting of the malformation because: (1) the radiologist had noted embolization procedures were not always curative, (2) petitioner's treatment options (for the AVM) were limited, (3) other treaters had concluded that an AVM can be congenital and does not depend on any trigger or inciting event, and (4) the radiologist did not record any physical examination, testing, or

provide a diagnosis, and further observing that the radiologist did not determine whether the AVM was compressing nerves, when such determination was the sole purpose of the visit"). The government asserts "it is not arbitrary or capricious for a special master to weigh physician's assessments against each other," especially when "contrary evidence is present in the record." *Id.* (citing *Hibbard v. Sec'y of Health & Hum. Servs.*, 100 Fed. Cl. 742, 749 (2011), *aff'd*, 698 F.3d 1355 (Fed. Cir. 2012)). In response to petitioner's argument the Chief Special Master failed to give deference to her treating physicians, the government insists "it is clear that the Chief Special Master weighed the opinions of several medical providers, and he articulated a rational basis for why he afforded more weight to certain opinions as opposed to others[, and] because the Chief Special Master's conclusions were based on plausible inferences, they were neither arbitrary nor capricious." *Id.* at 15.

As petitioner first argues the Chief Special Master applied an incorrect legal standard in determining petitioner failed to satisfy QAI 4, the Court starts by reviewing relevant precedent. Under QAI 4, petitioner must establish "[n]o other condition or abnormality is present that would explain [petitioner's] symptoms." 42 C.F.R. § 100.3(c)(10). "In determining whether to award compensation to a petitioner under the Program, the special master or court shall consider, in addition to all other relevant medical and scientific evidence contained in the record any diagnosis, conclusion, [or] medical judgment . . . which is contained in the record regarding the nature, causation, and aggravation of the petitioner's illness, disability, injury, condition, or death." 42 U.S.C. § 300aa-13(b)(1)(A). The Vaccine Act notes, however, "[a]ny such diagnosis, conclusion, judgment, test result, report, or summary shall not be binding on the special master or court," but requires "the special master or court [to] consider the entire record and the course of the injury." *Id.* at § 300aa-13(b)(1)(B).

Although diagnoses are not "binding on the special master" according to the Vaccine Act, Federal Circuit precedent has emphasized the pertinence of treating medical physicians' diagnoses. "[M]edical records warrant consideration as trustworthy evidence" because the records are generally contemporaneous and "contain information supplied to or by health professionals to facilitate diagnosis and treatment of medical conditions." *Cucuras v. Sec'y of Health & Hum. Servs.*, 993 F.2d 1525, 1528 (Fed. Cir. 1993). "With proper treatment hanging in the balance, accuracy has an added premium.*" Id.* "'[T]reating physicians are likely to be in the best position to determine whether a logical sequence of cause and effect show[s] that the vaccination was the reason for the injury.'"[6] *Andreu v. Sec'y of Health & Hum. Servs.*, 569 F.3d 1367, 1375 (Fed. Cir. 2009) (quoting *Capizzano v. Sec'y of Health & Hum. Servs.*, 440 F.3d 1317, 1326 (Fed. Cir. 2006); *see also Paluck v. Sec'y of Health & Hum. Servs.*, 756 F.3d 1373, 1385 (Fed. Cir. 2015) (noting "the special master erred in disregarding contemporaneous statements from [petitioner's] treating physicians regarding the cause of his [vaccine-related injury]"). "Weighing the persuasiveness of particular evidence often requires a finder of fact to assess the reliability of testimony, including expert testimony, and [the Federal Circuit] ha[s]

---

[6] When asked at oral argument if the government agreed with *Andreu* which states "treating physicians are likely in the best position to evaluate whether the vaccination was the reason for injury," the government stated "No," and "*Andreu* does not stand for that proposition." Tr. at 42:22–43:11; *see also* Tr. at 43:12–16 ("[THE COURT]: So you disagree with the notion that treating physicians are likely in the best position to evaluate whether the vaccination was the reason for injury? [THE GOVERNMENT]: Disagree.").

made clear that the special masters have that responsibility in Vaccine Act cases." *Moberly v. Sec'y of Health & Hum. Servs.*, 592 F.3d 1315, 1325 (Fed. Cir. 2010).

Instead of following Federal Circuit precedent, the Chief Special Master and the government cite opinions from *this* court.  First, the Chief Special Master and the government rely on a footnote buried in *Snyder*—a Court of Federal Claims case briefed prior to *Andreu*—to assert a treating medical provider's opinion is "not sacrosanct."[7]  SM Dec. at 13 (quoting *Snyder v. Sec'y of Health & Hum. Servs.*, 88 Fed. Cl. 706, 745 n.67 (2009)); Gov't's Resp. at 15 (quoting *Snyder*, 88 Fed. Cl. at 745 n.67).  Given three Federal Circuit cases elucidate the trustworthiness of medical opinions and describe treating physicians as being in the "best position to evaluate whether the vaccination was the reason for injury," the persuasive weight of the footnote in this court's prior opinion is minimal.  *See Cucuras*, 993 F.2d at 1528; *Andreu*, 569 F.3d at 1375; *Paluck*, 756 F.3d at 1385.  Second, the Chief Special Master and the government cite to this court's opinion in *Hibbard v. Secretary of Health and Human Services*, stating "[t]reaters' views should be weighed against other, contrary evidence also present in the record[—]including conflicting opinions among such individuals."  SM Dec. at 13 (citing 100 Fed. Cl. 742, 749 (2011)).  *Hibbard* correctly adheres to Federal Circuit precedent which requires special masters "to assess the reliability of testimony, including expert testimony," because *Hibbard* found the special master's evaluation was not arbitrary or capricious considering "[w]ith an extensive set of medical records from nearly twenty different doctors, many of which [were] inconclusive, the special master focused on the results of objective testing and the relative persuasiveness of the competing expert witnesses."  *Moberly*, 592 F.3d at 1325; *Hibbard*, 100 Fed. Cl. at 749.  *Hibbard* does not stand for, nor does it cite to binding precedent regarding, allowing special masters to discard medical diagnoses as competing without establishing a rational basis for why diagnoses are contrary or to evaluate the suppositions and bases of medical diagnoses in the absence of expert testimony.  *See Hibbard*, 100 Fed. Cl. at 749.  Notably, the record in *Hibbard* contained two expert reports, and the special master held two evidentiary hearings regarding the two experts—only after these expert reports and evidentiary hearings did the special master weigh the medical opinions.  *Id.* at 746–47; *see also Hibbard v. United States*, 698 F.3d 1355, 1368–69 (Fed. Cir. 2012) (noting the special master weighed the testimony of experts in arriving at his conclusion).  Considering Federal Circuit precedent explicated medical opinions are trustworthy, accurate, and are written by those in the "best

---

[7] In *Snyder*, this court noted "[a]fter briefing had concluded on petitioners' motion for review, but prior to oral argument, the Federal Circuit issued its decision in *Andreu*, reaffirming its prior holdings that the testimony of treating physicians is 'quite probative since treating physicians are likely to be in the best position to determine whether a logical sequence of cause and effect show[s] that the vaccination was the reason for the injury.'  However, there is nothing in *Andreu* that mandates that the testimony of a treating physician is sacrosanct—that it must be accepted in its entirety and cannot be rebutted."  *Snyder*, 88 Fed. Cl. at 745 n.67.  This court explained in the same footnote "an analysis of Andreu as it relates to the testimony of treating physicians is unnecessary here" because neither party raised the issue for the court's review.  *Id.*  As application of *Andreu* was "unnecessary" in *Snyder* and was not relevant to the disposition of the case, this court's statement regarding "testimony of a treating physician [not being] sacrosanct" is pure dictum.  *See id.*; *see also* Dictum, Black's Law Dictionary (12th ed. 2024) (defining dictum as "[a] judicial comment made while delivering a judicial opinion, but one that is unnecessary to the decision in the case and therefore not precedential (although it may be considered persuasive)").  Even if the statement was somehow binding, *arguendo*, the Chief Special Master and the government do not accurately characterize this court's dictum because this statement does not state, as they contend, "a treating medical provider's opinion is 'not sacrosanct'": this court merely observed "there is nothing in *Andreu* that mandates that the testimony of a treating physician is sacrosanct."  *Snyder*, 88 Fed. Cl. at 745 n.67.

position" to evaluate petitioner's injuries, a special master's conclusion survives review when the conclusion *heeds* medical opinions or is predicated on expert testimony (*i.e.*, expert reports or testimony at a hearing) which undermines medical opinions and renders the medical opinions as untrustworthy or unpersuasive. *Cucuras*, 993 F.2d at 1528; *Andreu*, 569 F.3d at 1375; *Moberly*, 592 F.3d at 1325.

Having evaluated binding precedent establishing medical records as trustworthy absent contrary expert testimony, the Court next determines whether the Chief Special Master assessed medical records in accordance with Federal Circuit precedent. Given the Vaccine Act requires consideration of the "course of injury," the Court finds it valuable to walk through the evolution of medical diagnoses in petitioner's medical records. *See* 42 U.S.C. § 100aa-13(b)(1)(B).

After petitioner received the Tdap vaccination on 21 July 2015 at The Vancouver Clinic, *see* 21 July 2015 Visit Summary at The Vancouver Clinic, Ex. 5 at 4–5, petitioner revisited the Clinic nine days later, when they diagnosed her with "Left shoulder pain," "ulnar nerve injury, left, initial encounter," and "Post-vaccination reaction, initial encounter," 30 July 2015 MPAS Progress Notes, Ex. 5 at 15–17. The Clinic referred petitioner to PT, *see id.*, where a doctor of physical therapy diagnosed petitioner with "[p]ain in shoulder," and "[i]njury of ulna nerve," *see* 24 August 2015 PT Initial Eval., Ex. 5 at 45. On 2 October 2015, petitioner underwent an MRI for "[u]nspecified polyarthropathy or polyarthritis, shoulder region." 2 October 2015 MRI Report, Ex. 5 at 37. A doctor found the MRI showed "no rotator cuff tear," a "large ganglion associated with subscapular recess of glenohumeral joint," and "posterior glenoid labrochondral irregularity of uncertain significance [but n]o anterior labral tear or bony evidence of previous dislocation." *Id.* at 37. On 15 October 2015, a different doctor—Dr. Ragsdale of Rebound Orthopedics—was "consult[ed] on [petitioner] regarding her left shoulder pain and weakness." 15 October 2015 Dr. Ragsdale Analysis, Ex. 5 at 40, 42. After looking at the MRI, the doctor found the MRI "showed a significant loculated appearing fluid in the subcoracoid bursa consistent with a large ganglion," and his impression was "this would be considered a result of her Buford complex and possible 1 way valve effect into the subcoracoid bursa," but noted petitioner "really had no symptoms at all until she had the injection on 07/21/2015." *Id.* at 42. In diagnosing the issue with petitioner's subcoracoid bursa, the doctor stated:

> The most common problem after injections is irritating the axillary nerve as it comes around through the deltoid. It certainly would be a cause for weakness or abduction. I am trying to put all the components of this together[,] though, with the ganglion and the weakness. There is certainly some possibility that she had irritation of her suprascapular nerve going to the supraspinatus, also causing irritation in the bursa with the fluid secondary to this. There is of course the possibility that she irritated her axillary nerve from the injection, but that she had had a preceding ganglion in the subcoracoid bursa.

*Id.* In these impressions, Dr. Ragsdale notes multiple possibilities for petitioner's injuries—one of which being a preceding ganglion. *Id.* Dr. Ragsdale referred petitioner to a different doctor

for "nerve conductions/EMG's,"[8] which "showed all of the nerves in the upper extremity were conducting normally and that her EMG's for supraspinatus, infraspinatus, and deltoid were *all normal*." *Id.* at 43 (emphasis added). Dr. Ragsdale then sent petitioner back to PT, *see id.*, who then diagnosed petitioner with "Axillary nerve palsy" and "Subcoracoid bursitis of left shoulder." 20 November 2015 Rebound Orthopedics PT Daily Note, Ex. 5 at 96. At this point, doctors were still investigating the reason behind petitioner's injuries and identified some possible diagnoses.

In December 2015, an orthopedist named Dr. DaSilva examined petitioner (and noted she was a "previous patient of Dr. Ragsdale"). 16 December 2015 Dr. DaSilva Visit Summary, Ex. 5 at 107. Dr. DaSilva "reviewed her imaging including her MRI which reveals the cyst," and because "[t]he cyst is in the region of the subscapularis," the doctor "th[ought] it would be reasonable to continue with physical therapy at this time and get a repeat MRI approximately 3 months from the original MRI." *Id.* A second MRI on 8 January 2016 showed "similar findings from her previous MRI in October[:] Rotator cuff is preserved without any tearing. There is a similar multilobulated soft tissue ganglion measuring approximately 6.4 *x* 2.5 *x* 1.9 cm within subscap recess. No obvious intraarticular labral injury. Long head of the biceps is maintained and in anatomic position. No obvious cartilage defects." 14 January 2016 Physician Assistant Notes, Ex. 5 at 115. Then, on 22 February 2016, petitioner underwent a "diagnostic anthroscopy," where doctors noted the biceps tendon, rotator cuff, and superior labrum were all intact. 22 February 2016 S.W. WA Reg. Surgery Center Operation Notes, Ex. 5 at 129. The doctors "were able to visualize cystic fluid decompressed" during the procedure, and at a visit a few weeks later, petitioner showed "well-preserved passive range of motion of the shoulder." *Id.* This means, after petitioner received the vaccination, consulted several doctors, and underwent two MRIs and a diagnostic anthroscopy, the doctors suspected a ganglion cyst could be a potential diagnosis.

Doctors continued to believe petitioner had a ganglion cyst throughout 2016 but also considered whether petitioner had a labral tear—a diagnosis they previously ruled out. *See* 22 December 2016 Dr. Weiganowicz Progress Notes, Ex. 5 at 338. To determine whether petitioner had a labral tear, a doctor considered recommending "arthroscopic surgery and possible repair." *Id.* In early 2017, an "MRI for left shoulder arthrogram w[ith] contrast" showed "no visible labral tear," but the doctor noted "[a]s the architecture and signal of the abnormality is *not typical of a classic ganglion cyst*, post IV contrast 3 plane fat-suppressed Tl imaging recommended to rule out solid tumor." 9 January 2017 MRI for Left Shoulder Arthrogram With Contrast Notes, Ex. 5 at 371–72 (emphasis added). A few months later, in March, petitioner underwent a "MRI left shoulder [without and with] contrast," which showed an "[a]t least predominantly solid heterogeneously enhancing mass associated with the superior margin of the subscapularis muscle is unchanged in size compared to prior studies." 6 March 2017 MRI Left Shoulder WO/W Contrast Notes, Ex. 5 at 372–73. As a result, the doctor opined "[t]his lesion likely represents a benign or low-grade mass and could be a myxoma or lymphatic or possibly

---

[8] For convenience, EMG is an shorthand for electromyography which "measures muscle response or electrical activity in response to a nerve's stimulation of the muscle[, and] is used to help detect neuromuscular abnormalities." ELECTROMYOGRAPHY (EMG), Johns Hopkins Medicine, https://www.hopkinsmedicine.org/health/treatment-tests-and-therapies/electromyography-emg.

vascular malformation (enhancement is similar to the adjacent vasculature)." *Id.* at 373.[9]  This was the first instance a doctor mentioned "vascular malformation" as a potential diagnosis.

At a follow-up appointment for the most recent MRI, on 29 March 2017, the doctor thought "[t]he mass may be consistent with a lymphatic vascular malformation[ but] does not have the appearance of a ganglion cyst." 29 March 2017 Dr. Wirganowicz Progress Notes, Ex. 5 at 348.  To determine whether vascular malformation was the correct diagnosis, the doctor "recommended she initially undergo a needle biopsy to confirm the presence of a[ ]vascular malformation and if this diagnosis is confirmed a referral to interventional radiology would be made for consideration of sclerotherapy injections." *Id.*  Petitioner then visited the Vascular Anomalies Clinic at OHSU, where resident/fellow Dr. Dhossche noted in a preliminary evaluation petitioner has "a vascular malformation of the left shoulder which is causing significant morbidity with daily pain and interference of daily activities, consistent with venous malformation." 8 August 2017 OHSU Medical Report, Ex. 5 at 732–33 (also noting an attending physician concurred with the resident/fellow's conclusion).  The doctor also noted "Dr Kaufman [(the Chair of the Department of Interventional Radiology)] performed ultrasound in clinic, symptoms of nerve pain seem unusual given location of this malformation and so referral for consultation with neurology to help sort this out was placed." *Id.* at 732; 9 January 2018 Dr. Kaufman Progress Notes, Ex. 5 at 752.  A few months later, in January 2018, Dr. Kaufman assessed petitioner as a "female with low-flow (likely venous as it contains phleboliths) malformation left shoulder that does not appear to involve the neurovascular structures by imaging but is associated with local pain, decreased ROM, and tingling in the fingers." 9 January 2018 Dr. Kaufman Progress Notes, Ex. 5 at 752.

With the working diagnosis of venous malformation, on 10 April 2018, Dr. Kaufman suggested an embolization, which "is not curative, but performed to control symptoms." 10 April 2018 Office Visit in Interventional Radiology, Ex. 26 at 373.  OHSU then performed the embolization on 2 July 2018. *See* 24 July 2018 OHSU Office Visit in Interventional Radiology, Ex. 26 at 306–09.  In August 2018, Dr. Kaufman noted "[n]o significant change in the VM from the last embolization, which was very limited but associated with symptomatic improvement." 21 August 2018 OHSU Office Visit in Interventional Radiology, Ex. 26 at 237–38.  Given petitioner returned with "pain symptoms left shoulder, decreased ROM, and weakness L[eft] hand," among others, and because petitioner "would like to proceed with another treatment," Dr. Kaufman ordered a "repeat embolization post Neurology eval at Ka[is]er." *Id.*  After the neurological evaluation resulted in no new findings, *see* Ex. 5 at 542, Dr. Kaufman conducted another embolization on 5 October 2018. *See* 1 October 2018 IR Angio Embolization Vascular Malformation Notes, Ex. 26 at 146–47.

Dr. Kaufman then started to question the accuracy of the venous malformation diagnosis in early 2019.  After the second embolization, on 8 January 2019, Dr. Kaufman's assessment called the venous malformation diagnosis into question given other diagnoses would more directly explain petitioner's pain:

---

[9] The Chief Special Master noted only "vascular malformation" in the Decision, despite the medical record hypothesizing the lesion could be a number of diagnoses, including "benign or low-grade mass and [] a myxoma or lymphatic or possibly vascular malformation." *Compare* 6 March 2017 MRI Left Shoulder WO/W Contrast Notes, Ex. 5 at 373 *with* SM Dec. at 6.

Disappointing result from embolization x 2.  At this point I think we should re-image the VM and also re-evaluate her shoulder for potential adhesive capsulitis or other pathology that would more directly explain the pain and limited ROM. The VM would more likely cause deep pain in the medial shoulder.  I am reluctant to try another embolization at this time as more aggressive treatment will increase the risk of neurovascular bundle injury.

8 January 2019 OHSU Office Visit in Interventional Radiology, Ex. 5 at 829.  Despite embolizations being associated with symptomatic improvement, petitioner reported on 15 March 2019 "her second left shoulder VM embolization [had] no improvement in symptoms."  15 March 2019 PT Eval., Ex. 5 at 599.  In June 2019, "patient's main symptom [was] Left sided shoulder and arm pain," and was referred to Dr. Kaul, a physiatrist, to "rule out CRPS."  3 June 2019 Dr. Kaul Office Visit, Ex. 5 at 652.  At this visit, Dr. Kaul diagnosed her with "two separate pain generators."  *Id.*  First, petitioner had left shoulder pain for four years and was "found to have cyst . . . then found to have AVM at the same site . . . [and] had adhesive capsulitis" at that visit.  *Id.*  Consequently, Dr. Kaul's first diagnosis was "[petitioner] appears to be (SIRVA) shoulder injury related to vaccine administration."  *Id.*  Petitioner's second diagnosis "appears to be a thoracic outlet syndrome / C8 pattern of symptoms[, and her] AVM is just in front of the glenohumeral joint and appears to potentially impact the brachial plexus / brachial vasculature."  *Id.*  Given there are other explanations for petitioner's symptoms, Dr. Kaul did not diagnose her with CRPS at the 5 June visit.  *Id.*  On a subsequent visit, Dr. Kaul recorded two "Assessment / Recommendations:"

> 1) Adhesive capsulitis.
> Better with lido to glenohumeral joint. Consider glenohumeral joint injection with corticosteroid.
> shoulder MRI was negative for glenohumeral joint/ labral pathology
> 2) AVM , anterior to glenohumeral joint. has been targeted twice with sclerotherapy. ? If it's proximity to the brachial plexus is causing some of the symptoms.

7 August 2019 Dr. Kaul Office Visit, Ex. 5 at 686–87.[10]

---

[10] The government admits the Chief Special Master previously awarded compensation to other petitioners who were diagnosed with adhesive capsulitis but disagrees adhesive capsulitis would constitute SIRVA.  Tr. at 74:13–75:24 ("[THE COURT:]  [T]he government agrees that adhesive capsulitis would constitute SIRVA?  [THE GOVERNMENT]: No, absolutely not, Your Honor. . . . Adhesive capsulitis is a tricky one, Your Honor, because it's not a very definitive diagnosis.  It's basically frozen shoulder.  So essentially, you could have frozen -- I'm going to get some water, Your Honor, I apologize.  THE COURT: Yep.  [THE GOVERNMENT]: You could have adhesive capsulitis and it not be a musculoskeletal injury. You could have adhesive capsulitis and it was a musculoskeletal injury. So that's a tricky, tricky sort of thing there. . . . [THE COURT:]  My question is, can adhesive capsulitis satisfy meeting a SIRVA Table claim?  [THE GOVERNMENT]:  Well, the diagnosis doesn't really come into play in the factors as much.  I think there are decisions where the Chief has held adhesive capsulitis was evidence of a musculoskeletal injury in some instances." ). *See also, e.g.*, *Reed v. Sec'y of Health & Hum. Servs.*, No. 19-0448V, 2022 WL 1027115, at *1 (Fed. Cl. Spec. Mstr. Mar. 2, 2022) (noting petitioner filed a SIRVA Table claim alleging "he suffered adhesive capsulitis that was caused-in-fact by a Tdap vaccine," and the government stipulated to settle the case and award compensation); *McDonald v. Sec'y of Health & Hum. Servs.*, No.

Given Dr. Kaul could not rule out AVM, he referred petitioner back to Dr. Kaufman, who continued to question the viability of venous malformation being the correct diagnosis: on 27 August 2019, Dr. Kaufman, after performing two embolizations, noted petitioner was a "23 year female with complex L[eft] shoulder pain following vaccination (SIRVA)," whose "working diagnoses include SIRVA, adhesive capsulitis, and thoracic outlet syndrome involving C8." 27 August 2019 OHSU Office Visit in Interventional Radiology, Ex. 5 at 803. Dr. Kaufman said petitioner "has not responded to shoulder surgery or toe embolization procedures," and "[a]s she has not had any real response to two embolization, I do not think that the VM [(*i.e.*, venous malformation)] is the cause of her pain, or that repeat embolization would be fruitful unless required in order to focus on other diagnoses." *Id.* After receiving Dr. Kaufman's report, on 2 October 2019, Dr. Kaul stated "[petitioner] does meet criteria for CRPS. Dr. Kaufman @ OHSU does not think the AVM is source of her symptom(s); rather is congenital that came to light after shoulder injury related to vaccine adminstration." 2 October 2019 Dr. Kaul Office Visit, Ex. 5 at 692. This means, the doctor who monitored, performed embolizations on, and evaluated petitioner for more than 1.5 years—and the Chair of the Department of Interventional Radiology—"did not think that the VM" explained petitioner's symptoms, and Dr. Kaul—the doctor who was referred by petitioner's physician—relied on the radiologist's conclusion in evaluating the course of petitioner's injury. 3 June 2019 Dr. Kaul Office Visit, Ex. 5 at 652; 2 October 2019 Dr. Kaul Progress Notes, Ex. 5 at 692; 27 August 2019 OHSU Office Visit in Interventional Radiology, Ex. 5 at 803; *cf.* 42 C.F.R. § 100.3(c)(10) ("No other condition or abnormality is present that would explain the patient's symptoms."); 42 U.S.C. § 300aa-13(b)(1)(B) ("[T]he special master or court [to] consider the entire record and the course of the injury.").

Having reviewed the evolution of medical diagnoses and the "course of injury," the Court considers whether the Chief Special Master considered all relevant evidence, drew plausible inferences, and articulated a rational basis for his conclusion "the medical record evidence preponderates *in favor of the vascular malformation* as potentially explaining Petitioner's injury." SM Dec. at 15 (emphasis added); *Paluck v. Sec'y of Health & Hum. Servs.*,

---

19-0855V, 2022 WL 624048, at *1 (Fed. Cl. Spec. Mstr. Jan. 26, 2022) (noting petitioner filed a SIRVA Table claim alleging "she suffered right shoulder adhesive capsulitis as a result of an influenza [] vaccine," and the government stipulated to settle the case and award compensation); *Marley v. Sec'y of Health & Hum. Servs.*, No. 14-1159V, 2015 WL 1915565, at *1 (Fed. Cl. Spec. Mstr. Apr. 3, 2015) (noting petitioner filed a Table claim alleging "he suffered adhesive capsulitis and/or a right shoulder injury that was caused-in-fact by his Hepatitis A, and [Tdap] vaccinations," and the government stipulated to settle the case and award compensation). The government asserts adhesive capsulitis would not support a SIRVA when a petitioner has a labral tear. Tr. at 76:6–19. Given petitioner's medical opinions here disclaimed a labral tear and considering the government concedes adhesive capsulitis has previously satisfied SIRVA Table claims, the Court notes the Chief Special Master may consider whether petitioner's treating physicians diagnosing petitioner with adhesive capsulitis (in addition and distinct from a C8 line of symptoms or an etiology related to a vascular malformation) satisfy SIRVA. *See, e.g.*, 2 October 2015 MRI Report, Ex. 5 at 37 (noting no labral tear); 9 January 2017 MRI for Left Shoulder Arthrogram With Contrast Notes, Ex. 5 at 371–72 (noting an "MRI for left shoulder arthrogram w[ith] contrast" showed "no visible labral tear); 3 June 2019 Dr. Kaul Office Visit, Ex. 5 at 652; 7 August 2019 Dr. Kaul Office Visit, Ex. 5 at 686–87. The Court also highlights Dr. Kaul's two medical opinions finding two separate pain generators mirror each other, with SIRVA substituted for adhesive capsulitis: on 3 June 2019, Dr. Kaul diagnosed petitioner with "SIRVA" and "thoracic outlet syndrome / C8 pattern of symptoms[ related to ] AVM, and, on 7 August 2019, he diagnosed petitioner with "adhesive capsulitis" and "AVM." 3 June 2019 Dr. Kaul Office Visit, Ex. 5 at 652; 7 August 2019 Dr. Kaul Office Visit, Ex. 5 at 686–87.

786 F.3d 1373, 1380 (Fed. Cir. 2015). Although "the OHSU interventional radiologist wrote that Petitioner's vascular malformation did not explain her symptoms," the Chief Special Master stated the radiologist's "rationale for saying so is not particularly clear" and "the radiologist's disclaiming of the malformation is not sufficiently supported by record evidence to give it great weight." SM Dec. at 14–15. The Chief Special Master instead concluded "it is relevant that the Kaiser orthopedist and sports medicine specialists accepted the vascular malformation as likely explaining Petitioner's symptoms." *Id.*

The Chief Special Master "cloak[s]" the failure to presume medical records as accurate "in the guise of a credibility determination" without expert opinion. *Andreu v. Sec'y of Health & Hum. Servs.*, 569 F.3d 1367, 1379 (Fed. Cir. 2009) ("While considerable deference must be accorded to the credibility determinations of special masters, this does not mean that a special master can cloak the application of an erroneous legal standard in the guise of a credibility determination, and thereby shield it from appellate review.") (internal citations omitted); *Moberly v. Sec'y of Health & Hum. Servs.*, 592 F.3d 1315, 1325 (Fed. Cir. 2010); SM Dec. at 3 ("Contemporaneous medical records are presumed to be accurate.") (internal citations omitted). While acknowledging Dr. Kaufman contemporaneously "wrote that [p]etitioner's vascular malformation did not explain her symptoms," the Chief Special Master doubted the bases for Dr. Kaufman's conclusion. SM Dec. at 14. For example, the Chief Special Master stated embolizations would not be curative and Dr. Kaufman did not want to perform a third embolization—but Dr. Kaufman noted embolizations are "associated with symptomatic improvement" in AVM patients, which did not happen here. *Compare* SM Dec. at 14 ("Regarding the lack of response to two embolizations, the radiologist had previously warned that such procedures were not curative, and he was not willing to perform a third embolization because of the risks of vascular or nerve injury.") (internal citation omitted) *with* 21 August 2018 OHSU Office Visit in Interventional Radiology, Ex. 26 at 237–38 ("[n]o significant change in the VM from the last embolization, which was very limited but *associated with symptomatic improvement*") (emphasis added); *see also* 27 August 2019 OHSU Office Visit in Interventional Radiology, Ex. 5 at 803. As another example, the Chief Special Master noted Dr. Kaufman "did not acknowledge that numerous orthopedic evaluations and seven MRIs had not detected any specific, alternative musculoskeletal explanation that would explain the injury"—but many of these evaluations served as the precursor to petitioner being referred to Dr. Kaufman for his assessments and embolizations, and Dr. Kaufman *does* cite to MRIs in his clinic notes when assessing whether petitioner's pain is neurological. SM Dec. at 14; 3 April 2019 Telephone Encounter in Interventional Radiology, Ex. 5 at 814–15 (comparing 3 March 2017 MRI with 5 February 2019 MRI); *see also* 27 August 2019 Office Visit in Interventional Radiology, Ex. 5 at 803 (Dr. Kaufman acknowledging embolizations, EGD, EMG, and arthroscopy in his progress notes). In fact, Dr. Kaufman ordered an MRI on 8 January 2019, and referred petitioner to "Orthopedics and Rehabilitation" because "22 year female with persistent L shoulder pain [did] not respond[] to embolization of venous malformation[, and p]atient has limited ROM *not consistent with the malformation*." 8 January 2019 Office Visit in Interventional Radiology, Ex. 5 at 830–31 (emphasis added). As a last example, the Chief Special Master asserted Dr. Kaufman's "'ruling out' of the AVM also depended heavily on the AVM being apparently asymptomatic beforehand, and the vaccine's temporal association with the onset of shoulder pain"—but analogous to the Chief Special Master noting "[Dr. Kaufman's] rationale for saying so is not particularly clear," neither was the Chief Special Master's rationale for disregarding

new medical diagnoses for older diagnoses. SM Dec. at 14. Moreover, other doctors referred petitioner to Dr. Kaufman for the purpose of evaluating petitioner's potential vascular malformation, meaning Dr. Kaufman is "likely to be in the best position to determine whether a logical sequence of cause and effect show[s] that the vaccination was the reason for the injury." *Andreu*, 569 F.3d at 1375. While Chief Special Masters are tasked with evaluating credibility of expert testimony, neither the Chief Special Master nor the government identified any binding precedent encouraging special masters to disagree with medical doctors without contrary expert opinion. Especially considering these contemporaneous medical records are for "proper treatment hanging in the balance[ meaning] accuracy has an extra premium" and because the records "warrant consideration as trustworthy evidence," the Chief Special Master erred by failing to "draw[] plausible inferences[] and articulate a rational basis" for disregarding medical conclusions from a specialist tasked to evaluate whether petitioner had venous malformation. *Cucuras*, 993 F.2d at 1528; *Paluck*, 786 F.3d at 1380.

    The Chief Special Master also disagreed with the Kaiser physiatrist and did not review the course of injury in petitioner's medical records. While the Chief Special Master cited to the physiatrist's medical record on page 652 of Exhibit 5—where the physiatrist did opine AVM "appears to potentially impact the brachial" region—the Chief Special Master did not articulate any rationale to reject the same physiatrist's re-evaluation of petitioner's medical records after Dr. Kaufman ruled out AVM on page 692 of Exhibit 5. *Compare* SM Dec. at 14 *with* Ex. 5 at 692. Despite Dr. Kaufman and Dr. Kaul noting procedures intended to improve petitioner's symptoms if a diagnosis of AVM were accurate, the Chief Special Master found "the physiatrist's opinion seems influenced by the temporal association with the vaccine, rather than evidence that diminished the AVM as a confounding factor." SM Dec. at 14. As another example of failing to consider all relevant evidence, the Chief Special Master found CRPS "was ruled out by the Kaiser physiatrist in 2019." SM Dec. at 15 n.17. On the same page discussed immediately above—page 692 of Exhibit 5—Dr. Kaul expressly found "Patient *does* meet criteria for CRPS." Ex. 5 at 692 (emphasis added); *see also* Tr. at 141:8–21 ("[THE COURT]: So to confirm, on page 692, Dr. Kaul is summarizing the current diagnoses of petitioner coming into the visit after Dr. Kaufman. And that is what clarifies that petitioner does meet criteria for CRPS, and then Dr. Kaufman is the one who has removed the AVM diagnosis. [THE GOVERNMENT]: I don't agree with that statement, Your Honor. I would characterize these records as nothing more than a repeat of what the interventional radiologist had concluded, and the Chief Special Master addressed that piece of evidence. THE COURT: Isn't that what I said? It's Dr. Kaufman[,] the radiologist. [THE GOVERNMENT]: Correct."); Tr. at 145:7–147:15 ("[THE GOVERNMENT]: There was a conclusion that she didn't have CRPS, right? [The Chief Special Master] had already made that conclusion, correct? I mean, I'm not trying to ask the questions. I just -- I'm getting -- that was already concluded. . . . [PETITIONER]: I think this record shows that Dr. Kaul has changed his mind on the diagnosis of CRPS. THE COURT: Yeah. Response, [government]? [THE GOVERNMENT]: It does say, Patient does not meet criteria for CRPS. I agree that that's what the record states. [PETITIONER]: It says it does meet it. [THE GOVERNMENT]: Or, excuse me, does meet the criteria for CRPS. And I would point that that would actually speak to multiple symptoms. That's what complex regional pain syndrome is. . . . [PETITIONER]: Dr. Kaul previously had stated that Mrs. Chu could not meet the criteria of CRPS because she had an alternate source or potential source of her pain. After going to see Dr. Kaufman, Dr. Kaufman said the AVM was not the source of her symptoms. I

think this record reflects that Dr. Kaul has now said she meets the criteria for CRPS because the one thing that was holding up that -- meeting that criteria has now been removed. THE COURT: [Response from counsel for the government]? [THE GOVERNMENT]: I don't interpret the record that way, Your Honor. THE COURT: How do you interpret it? [THE GOVERNMENT]: Again, I think he's just noting Dr. Kaufman's conclusion. He does appear to say that patient does meet the criteria for complex regional pain syndrome."). Moreover, the Chief Special Master noted "[f]urther explanation would be necessary to rule out this potential alternative explanation." SM Dec. at 14. While both parties agree "evidence of a concurrent condition or abnormality does not *per se* preclude a Table SIRVA claim (or the ability to establish the fourth QAI criterion)," the Chief Special Master did not discuss how the potential alternative explanation of AVM foreclosed petitioner's Table SIRVA claim. Gov't's Resp. at 13 (internal citations omitted); *see also* Mot. for Rev. at 11 (internal citations omitted). Considering the Chief Special Master did not demonstrate consideration of all relevant evidence or cite or discuss the subsequent medical opinion by Dr. Kaul on page 692 of Exhibit 5, or articulate a rational basis for why AVM foreclosed petitioner's Table SIRVA despite the parties agreeing a concurrent condition does not *per se* preclude petitioner's claim, the Chief Special Master acted arbitrarily and capriciously. *Paluck*, 786 F.3d at 1380.

Finally, the Chief Special Master assigned weight to these medical opinions based on the opinions being "competing," without explaining how the opinions were "competing." *See* SM Dec. at 13. Specifically, the Chief Special Master compared medical opinions from the Kaiser orthopedist and sports medicine specialists in 2016, against medical opinions from Dr. Kaufman and Dr. Kaul *three years later*. *See id.* at 13–15. The Vaccine Act acknowledges petitioner's injuries and its associated medical diagnoses undergo a "course of injury," meaning diagnoses and medical theories change over time. 42 U.S.C. § 300aa-13(b)(1)(B). The Chief Special Master, here, ignored this change of diagnoses over time, preferring instead to select preliminary opinions in lieu of later opinions. As one example, the Chief Special Master noted "[t]he OHSU vascular anomaly clinic's initial evaluation record . . . further cuts against Petitioner," because the record "explains the expected natural history of a vascular malformation," which could remain asymptomatic for years.[11] SM Dec. at 14 (internal citations omitted). Dr. Kaufman's 2019 medical conclusion, however, was the result of more than a year of treatment at OHSU. By ignoring Dr. Kaufman's 2019 medical conclusion, the Chief Special Master contravened the Vaccine Act's requirement to consider the "course of injury." Further, given "course of injury" indicates an evolution of medical diagnoses and considering the medical diagnoses evolved over

---

[11] The Court notes the Chief Special Master opined the OHSU's clinic "cuts against Petitioner, under *42 C.F.R. § 100.3(c)(10)(iii)*"—which is QAI 3. SM Dec. at 14 (emphasis added). The Chief Special Master cited but did not explain this record in his string citation relating to his discussion of QAI 3—insofar as the Chief Special Master intended to analyze these records under QAI 3 *and* QAI 4, the Chief Special Master may do so on remand. *See supra* Section VI. Second, the Chief Special Master compared petitioner's vascular malformation to "calfcic tendinosis[—] another condition that has foreclosed several past Table SIRVA claims." SM Dec. at 15 n.16. Neither the Chief Special Master, the government, nor petitioner have identified any record evidence mentioning or supporting this comparison. The province of this court and the Office of Special Masters is to consider "evidence contained *in the record*." 42 U.S.C. § 300aa-13(b)(1)(A) ("In determining whether to award compensation to a petitioner under the Program, the special master or court shall consider, in addition to all other relevant medical and scientific evidence *contained in the record* any diagnosis, conclusion, [or] medical judgment . . . which is *contained in the record* regarding the nature, causation, and aggravation of the petitioner's illness, disability, injury, condition, or death.") (emphasis added).

time from, for example, ulnar nerve injury to ganglion cyst, the Chief Special Master failed to articulate rational basis for treating the physicians' medical opinions as contrary to each other.[12] *Paluck v. Sec'y of Health & Hum. Servs.*, 786 F.3d 1373, 1380 (Fed. Cir. 2015).

Accordingly, the Chief Special Master disagreed with contemporaneous medical records penned by those in the "best position" to evaluate petitioner's injuries, opined on the accuracy of medical diagnoses without analyzing whether they were competing and without expert testimony, and arrived at a conclusion *disclaimed* by Dr. Kaufman (and relied on by Dr. Kaul) before the filing of this protest. The Court, like in Section VI *supra*, does not make a factual finding related to whether petitioner satisfies QAI 4 nor does it instruct the Chief Special Master to require expert testimony. Instead, the Court remands to the Chief Special Master to determine whether the medical records were competing (which also includes determining whether expert testimony would assist in evaluating the trustworthiness and persuasiveness of the medical records and their suppositions and bases); and to assess whether petitioner's medical records, when analyzed in accordance with Federal Circuit precedent, establish QAI 4. *Hines v. Sec'y of Health & Hum. Servs.*, 940 F.2d 1518, 1528 (Fed. Cir. 1991); *Paluck v. Sec'y of Health & Hum. Servs.*, 786 F.3d 1373, 1380 (Fed. Cir. 2015) ("While review of the factual findings made by a special master is highly deferential, both the Court of Appeals for the Federal Circuit and the Court of Federal Claims have a duty to ensure that the special master has properly applied Vaccine Act evidentiary standards, 'considered the relevant evidence of record, drawn plausible inferences and articulated a rational basis for the decision.'" (cleaned up)).

## VIII.   Whether Special Masters are Tasked to "Guard Against Compensation"

The Court concludes by evaluating the province of the Office of Special Masters and this court for SIRVA Table Claims in view of the Vaccine Act (and amendments thereto) and Federal Circuit precedent to determine whether the Vaccine Act tasks special masters with "guard[ing] against compensation" for Table SIRVA claims. In his Decision, the Chief Special Master

---

[12] The Federal Circuit "has unambiguously explained that special masters are expected to consider the credibility of expert witnesses in evaluating petitions for compensation under the Vaccine Act." *Porter v. Sec'y of Health & Hum. Servs.*, 663 F.3d 1242, 1250 (Fed. Cir. 2011). "The fact-finder has broad discretion in determining credibility because he saw the witnesses and heard the testimony." *Bradley v. Sec'y of Health & Hum. Servs.*, 991 F.2d 1570, 1575 (Fed. Cir. 1993) (citing *Griessenauer v. Dep't of Energy*, 754 F.2d 361, 364 (Fed. Cir. 1985)). While binding precedent grants special masters the role of weighing the persuasiveness of opinion testimony, here, the Chief Special Master did not entertain expert opinions (indicating there may be no basis for analyzing the credibility of opinions). Suppose the parties proffered expert reports describing the medical records: then, the Chief Special Master is at liberty to assign weight based on the credibility of the experts. *Id.* To help elucidate which party's expert was more reliable, the Chief Special Master could also welcome expert testimony at a hearing. While special masters are graced with discretion to determine the procedures for their vaccine cases (*i.e.*, choosing to hold a hearing, postponing Rule 4(c) reports, etc.), insofar as special masters wish to make credibility determinations on the suppositions or bases of treating physicians' diagnoses (or nitpick the results of a procedure), they should consider allowing the parties to proffer expert opinions *so that* the special master can make credibility determinations. In other vaccine cases where "the medical evidence was not definitive, the special master relied heavily on expert medical testimony." *Broekelschen v. Sec'y of Health & Hum. Servs.*, 618 F.3d 1339, 1347 (Fed. Cir. 2010). Although the majority of instances requiring expert opinion testimony are causation-in-fact cases, considering *Andreu* requires a presumption of accuracy for medical records, in Table cases, special masters should consider deferring to the medical records, or solicit expert testimony if the medical records are not definitive. *See id.*; *Andreu*, 569 F.3d at 1375.

declares the purpose of one of the Qualifications and Aids to Interpretation "is to '*guard against compensating claims* involving patterns of pain or reduced range of motion indicative of a contributing etiology beyond the confines of a musculoskeletal injury to the affected shoulder.'" SM Dec. at 12 (quoting *Valdez v. Sec'y of Health & Hum. Servs.*, No. 21-0394V, 2024 WL 1526536 (Fed. Cl. Spec. Mstr. Feb. 28, 2024) (citing *Grossman*[13] *v. Sec'y of Health & Hum. Servs.*, No. 18-0013V, 2022 WL 779666, at *15 (Fed. Cl. Spec. Mstr. Feb. 15, 2022)) (emphasis added). The government agrees with the Chief Special Master, noting "it is *well established* that the third QAI's purpose is to guard against compensating claims." Gov't Resp. at 10 (emphasis added). At oral argument, the government contended prior opinions from this court support the Chief Special Master's "guard against compensating claims" role, but when pressed further, the government could not identify binding precedent or statutory support to substantiate its claim. *See generally* Tr. at 25:3–36:25. In determining whether the CSM is tasked with "guard[ing] against compensating claims," the Court starts by reviewing the procedures detailed in the Vaccine Act to the Office of Special Masters and this court as well as the differences between table claims and off-table claims, and concludes by determining whether "guard[ing] against compensation" exhibits legal analysis contrary to the Vaccine Act and precedent.

The Vaccine Act is instructive in describing the procedure of a vaccine case. Under 42 U.S.C. § 300aa-12(a), "[t]he United States Court of Federal Claims and the United States Court of Federal Claims special masters shall, in accordance with this section, have jurisdiction over proceedings to determine if a petitioner under section 300aa–11 of this title is entitled to compensation under the Program and the amount of such compensation." After a petitioner files "a petition for compensation under the Program for a vaccine-related injury," this Court's clerk "[i]mmediately forward[s] the filed petition to the chief special master for assignment to a special master." *See* 42 U.S.C. § 300aa-11(a)(1), (c); § 300aa-12(d)(1). Unlike the rigorous and formalistic nature of federal court litigation, the Vaccine Act mandates the rules for special master proceedings, *inter alia*, "shall[] provide for a *less-adversarial,*[14] *expeditious, and*

---

[13] The Court notes, although this case is titled *Grossmann*—with two "n"s—upon review of the special master's decision and the petition in that case, petitioner's last name is spelled *Grossman*—with only one "n." *See Grossman*, 2022 WL 779666, at *1 ("On January 2, 2018, petitioner, Susan *Grossman*, filed a petition . . . .") (emphasis added); *see also* Pet. for Vaccine Comp. – SIRVA (Table Injury), *id.*, ECF No. 1 ("Petitioner, Susan *Grossman*, by and through her undersigned counsel, hereby requests compensation under the National Vaccine Injury Compensation Program . . . .") (emphasis added).

[14] Despite the Vaccine Act requiring less adversity in proceedings, the government endeavored to oppose many facets of petitioner's case—even those having little impact on the resolution of petitions. *See, e.g., supra* n.10. For example, at oral argument, the government disagreed with the plain language of a medical record documented by petitioner's radiologist stating he conducted a physical exam: on page 11 of the Decision, the Chief Special Master, citing to Dr. Kaufman's notes from petitioner's visit on 27 August 2019 on page 803 of Exhibit 5, stated the purpose of the visit to the radiologist "was to evaluate whether the vascular malformation was compressing nerves – but he did not record any physical examination, testing, direct answer to that question, or diagnosis of his own." SM Dec. at 11 (citing 27 August 2019 OHSU Office Visit in Interventional Radiology, Ex. 5 at 803). On the immediately succeeding page (containing the same header as page 803), the radiologist noted: "I performed a medical record review, history, physical exam, and formulation of a treatment plan." Ex. 5 at 804. In a prolonged colloquy, when the Court asked if the government "would agree that [the doctor] did review, record, and perform a physical exam," the government responded "I don't think so . . . I don't think he performed a medical exam or review. It would have been noted on 803 as the Chief cited." Tr. at 134:13–139:9. The government's position is, because the Chief Special Master cited page 803, "[t]he record that we need to be focusing on is on 803," and any material on page

*informal proceeding* for the resolution of petitions, [and] include flexible and informal standards of admissibility of evidence."[15] *Id.* § 300aa-12(d)(2) (emphasis added). "It is well-established that the Vaccine Act is a 'pro-claimant regime' meant to allow injured individuals a fair and fast path to compensation." *J.A.C. v. Sec'y of Health & Hum. Servs.*, No. 25-1751, 2025 WL 3749714, at *1 (Fed. Cir. Dec 29, 2025). As one example of the "pro-claimant" nature of the Vaccine Act, the Federal Circuit noted Congress intended "close calls regarding causation [to be] resolved in favor of the injured claimants." *Althen v. Sec'y of Health and Hum. Servs.*, 418 F.3d 1274, 1280 (Fed. Cir. 2005).[16] The Vaccine Act further emphasizes special masters must hasten when deciding whether petitioner is entitled to compensation: "[t]he decision of the special master shall[] include findings of fact and conclusions of law, and[] *be issued as expeditiously as*

---

[15] 804 "is a mistake" and "carryover from an earlier record" given "when [a doctor] sign[s] [a] document, that's the end of the record. . . . It's very common for there to be language that continues in the records, but usually the signature denotes the end of the current record." *Id.* Although the Court is not making a factual finding here, the Court emphasizes the Federal Circuit's precedent stating medical records warrant consideration as trustworthy evidence and the Vaccine Act requiring "less-adversarial" proceedings. *Cucuras*, 993 F.2d at 1528; 42 U.S.C. § 300aa-12(d)(2).

[15] Commentators routinely highlight the need for vaccine proceedings to be "less-adversarial, expeditious, and informal." For example, professor Renée Gentry of the Vaccine Injury Litigation Clinic at the George Washington University School of Law testified before the House Oversight Committee, Select Subcommittee on the Coronavirus Pandemic on 21 March 2024, "Congress intended that the [Vaccine Injury Compensation Program ("VICP")] provide individuals (petitioners) a swift, flexible, and non-adversarial alternative to the often costly and lengthy traditional civil tort litigation." *Assessing America's Vaccine Safety Systems, Part 2 Before the House Oversight and Accountability Select Subcommittee on the Coronavirus Pandemic,* 118th Congress (Statement of Renee J. Gentry, Professorial Lecturer, The George Washington University), available at https://oversight.house.gov/wp-content/uploads/2024/03/Gentry-Testimony.pdf. Gentry also noted compensation for vaccine injury is deducted from a ~$4 billion fund, paid through a vaccine manufacturer excise tax. *Id.*

Some commentators even express distaste for adversarialism and sluggishness permeating today's vaccine proceedings despite statutory directives. *See, e.g.*, Nora F. Engstrom, *A Dose of Reality for Specialized Courts: Lessons from the VICP*, 163 Penn L. Rev. 1631, 1711–13 (2015) ("[T]he VICP . . . aim[s] to quell the adversarialism of dispute resolution. But, when assessing why the VICP has struggled, it seems obvious that one final reason is that adversarialism has crept back in. . . . [A]s early as 1989, Congress expressed regret that, despite this statutory directive, 'all participants ha[d], to some degree, maintained their traditional adversarial litigation postures." (quoting H.R. REP. NO. 101-247, at 512 (1989)); Peter H. Meyers, *Fixing the Flaws in the Federal Vaccine Injury Compensation Program*, 63 Admin. L. Rev. 785, 851 (2011) (noting the Vaccine program "is no longer the quick, informal, and less adversarial program that Congress intended it to be."). "Of petitions filed between 1999 and March 31, 2014, the Program's average adjudication time clocked in at about five-and-a-half years[, and] it takes more time, on average, to process claims within the Program than it does to process claims, *through judgment*, within the traditional tort system." Nora F. Engstrom, *supra*, at 1685–86 (emphasis in original) (citations omitted).

Congress itself noted the VICP devolving into an adversarial process indistinguishable from civil lawsuits. *See* H.R. REP NO. 106-977, at 12–13 (2000) ("As the DOJ has pursued aggressive defenses in compensation cases, entitlement and compensation determinations have been perceived by some petitioners as being inappropriately adversarial in nature.").

[16] The Chief Special Master discussed whether petitioner could file an off-Table claim under the three-element test set forth in *Althen*—but appears to misstate *Althen* and/or the facts of the present case. Specifically, the Chief Special Master wrote "Petitioner might be able to show that a preexisting shoulder injury was exacerbated by the *flu* vaccine (assuming that *he* could meet the three elements of the test set forth in Althen. . .)." SM Dec. at 15 (emphasis added). Ms. Chu, here, did not receive the flu vaccine: *she* received the Tdap vaccine. *Id.* at 1. Similarly, in *Althen*, petitioner Ms. Althen received the tetanus toxoid and hepatitis A vaccines. *Althen v. Sec'y of Health & Hum. Servs.*, 418 F.3d 1274, 1276 (Fed. Cir. 2005). Both parties agreed at oral argument the Chief Special Master's statement here is an "error." Tr. at 21:6–12.

*practicable*." *Id.* § 300aa-12(d)(3)(A) (emphasis added).  After a special master renders a decision, if a party moves for review, this court has jurisdiction to undertake the review.  *Id.*; *Id.* § 300aa-12(e).

For vaccine injuries listed on the Table,[17] "symptoms and injuries associated with each listed vaccine and a timeframe for each symptom or injury[:]  Congress has thus determined that if a petitioner can establish that she received a listed vaccine and experienced such symptoms or injuries within the specified timeframes, she has met her prima facie burden to prove that the vaccine caused her injuries." *de Bazan v. Sec'y of Health & Hum. Servs.*, 539 F.3d 1347, 1351 (Fed. Cir. 2008) (citing 42 U.S.C. § 300aa–14); *see also Grant v. Sec'y of Health & Hum. Servs.*, 956 F.2d 1144, 1146–47 (Fed. Cir. 1992) (noting a Table claim is satisfied when a petitioner demonstrates the alleged injury met criteria listed in the Table).  "Given the clarity of the issues and the ease with which such evidence may generally be adduced, however, it is unsurprising that the Guidelines note that '[m]ost Table cases are quickly resolved, in keeping with congressional intent that vaccine injured persons be compensated quickly, easily, and with generosity." MATTHEW H. SOLOMSON, COURT OF FEDERAL CLAIMS: JURISDICTION, PRACTICE, AND PROCEDURE § 18-24 (2016) (quoting COURT OF FED. CLAIMS, OFFICE OF SPECIAL MASTERS, GUIDELINES FOR PRACTICE UNDER THE NATIONAL VACCINE INJURY COMPENSATION PROGRAM, at 48 (revised 3 March 2025)).[18]  Though Congress enacted the Vaccine Act in the 1980s and included a Vaccine Injury Table, it empowered the Secretary of Health and Human Services to promulgate regulations to modify the Vaccine Injury Table by "add[ing] to, or delet[ing] from, the list of injuries, disabilities, illnesses, conditions, and deaths for which compensation may be provided" after conducting a public notice and comment period.  42 U.S.C. § 300aa-14(c)(3).  In 2017, after providing a 180-day comment period and holding a public hearing on amending the Table, the Secretary revised the Vaccine Injury Table to include, *inter alia*, Qualifications and Aids to Interpretations for SIRVA.  *See* 82 Fed. Reg. 6294, 6299 (Jan. 19, 2017); 42 C.F.R. § 100.3(a), (c)(10).  The Table included a preamble and the four QAIs discussed *supra* to analyze whether a petitioner's SIRVA Table claim was meritorious:

> (10) Shoulder injury related to vaccine administration (SIRVA).  SIRVA manifests as shoulder pain and limited range of motion occurring after the administration of a vaccine intended for intramuscular administration in the upper arm.  These symptoms are thought to occur as a result of unintended injection of vaccine antigen or trauma from the needle into and around the underlying bursa of the shoulder resulting in an inflammatory reaction.  SIRVA is caused by an injury to the musculoskeletal structures of the shoulder (e.g. tendons, ligaments, bursae, etc.).  SIRVA is not a neurological injury and abnormalities on neurological examination or nerve conduction studies (NCS) and/or electromyographic (EMG) studies would not support SIRVA as a diagnosis (even if the condition causing the neurological

---

[17]  The Court further notes the instant case was referred to the Special Processing Unit ("SPU"), which "is designed to increase the Vaccine Program's ability to provide for the expedited and informal resolution of claims that appear reasonably likely to settle at the outset of the matter's filing."  COURT OF FED. CLAIMS, OFFICE OF SPECIAL MASTERS, GUIDELINES FOR PRACTICE UNDER THE NATIONAL VACCINE INJURY COMPENSATION PROGRAM, at 37 (revised 3 March 2025).

[18]  Internal citation updated to reflect amended version of document.

abnormality is not known).  A vaccine recipient shall be considered to have suffered SIRVA if such recipient manifests all of the following:

(i) No history of pain, inflammation or dysfunction of the affected shoulder prior to intramuscular vaccine administration that would explain the alleged signs, symptoms, examination findings, and/or diagnostic studies occurring after vaccine injection;

(ii) Pain occurs within the specified time-frame;

(iii) Pain and reduced range of motion are limited to the shoulder in which the intramuscular vaccine was administered; and

(iv) No other condition or abnormality is present that would explain the patient's symptoms (e.g. NCS/EMG or clinical evidence of radiculopathy, brachial neuritis, mononeuropathies, or any other neuropathy).

42 C.F.R. § 100.3(c)(10).  Based on *de Bazan*, the QAI are akin to a checklist—if a petitioner establishes she received a vaccine listed on the Table and experienced symptoms contemplated by the Table, petitioner need only "check off" each QAI to receive compensation.  *See* 539 F.3d at 1351.  In contrast to off-Table claims, where petitioner "is not afforded a presumption of causation and thus must prove causation-in-fact," Table claims offer a much simpler process and propose a more expeditious route to compensation when compared to off-Table claims.  *See id.*

Considering the alleviated procedural requirements of vaccine claims and the presumption of causation when the QAI are met, the Court evaluates whether the Chief Special Master's concept of "guard[ing] against compensation" is contrary to law, first by determining from where the concept derived and then by assessing whether the concept aligns with settled precedent.  To trace back the origins of the "guard against compensating claims" language, the Court reviews the progeny of cases cited by the government and the Office of Special Masters.  The Decision here quoted *Valdez v. Sec'y of Health & Hum. Servs.*, No. 21-0394V, 2024 WL 1526536 (Fed. Cl. Spec. Mstr. Feb. 28, 2024) ("*Valdez*"), which cited *Grossman v. Sec'y of Health & Hum. Servs.*, No. 18-0013V, 2022 WL 779666, at *15 (Fed. Cl. Spec. Mstr. Feb. 15, 2022)) ("*Grossman*").  SM Dec. at 12.  The Chief Special Master authored *Valdez*, and Special Master Horner wrote *Grossman*.  *Valdez*, 2024 WL 1526536; *Grossman*, 2022 WL 779666.  In *Grossman*, Special Master Horner, citing to *Werning v. Secretary of Health and Human Services*, wrote "it is clear that the gravamen of this requirement is to guard against compensating claims involving patterns of pain or reduced range of motion indicative of a contributing etiology beyond the confines of a musculoskeletal injury to the affected shoulder."  *Grossman*, 2022 WL 779666, at *15 (citing *Werning v. Sec'y of Health & Hum. Servs.*, No. 18-0267V, 2020 WL 5051154, at *10 (Fed. Cl. Spec. Mstr. July 27, 2020)).  *Werning*, although noting "[petitioner] did initially mention pain travelling to her hand shortly after vaccination and once again after her shoulder surgery," found petitioner established QAI 3—but did not mention "guard[ing] against compensating claims," nor analyzed binding authority to opine on the intent behind QAI 3, as suggested by *Grossman*.  *Werning*, 2020 WL 5051154, at *10.

Considering *Grossman* invented "this requirement [of] guard[ing] against compensating claims" under QAI 3 and because the Chief Special Master relied on this requirement in the present action, the Court reviews whether the requirement is supported by precedent or the Table. *Grossman* starts the QAI 3 discussion by analyzing the government's response to a public comment, reproduced in full below:

> Comment:  A commenter suggested that shoulder injury related to vaccine administration (SIRVA) as defined in the QAI is too restrictive because the recipient's pain and reduced range of motion must be limited to the shoulder in which the intramuscular vaccine was administered.  The commenter stated that such language was an artificial and unnecessary qualification, and expressed concern that recipients who have other symptoms, such as shoulder pain radiating to the neck or upper back, will not have the benefits of a Table injury.  The commenter suggested that the QAI be expanded to include the shoulder and parts of the body attributed to that injury.

> Response:  SIRVA is a musculoskeletal condition caused by injection of a vaccine intended for intramuscular administration into the shoulder, and, as its name suggests, the condition is localized to the shoulder in which the vaccine was administered.  In other words, pain in the neck or back without an injury to the shoulder in which an individual received a vaccine would not be considered SIRVA.  Shoulder injuries that are not caused by injection occur frequently in the population.  Thus, it is important to have a definition of SIRVA that is clearly associated with vaccine injection.  The portion of the QAI limiting the pain and reduced range of motion to the shoulder in which the vaccine was administered is necessary to accurately reflect the vaccine-associated condition.

*Grossman*, 2022 WL 779666, at *15 (citing 82 Fed. Reg. 6294, 6296).  Based on this Federal Register Response, the special master disagreed with petitioner's position "shoulder pain with accompanying neck pain necessarily falls under the SIRVA rubric in all events."  *Id.*  The special master further noted the Response "reveals that the third SIRVA criterion is intended to ensure that SIRVA claims are limited to instances in which '*the condition* is localized to the shoulder in which the vaccine was administered.'"  *Id.* (quoting 82 Fed. Reg. 6294, 6296).  Nothing in the Response demonstrates QAI 3 is intended to foreclose compensation for petitioners who have two (or more) separate conditions.  Specifically, the Response notes "*the* condition is localized to the shoulder," which means so long as petitioner has *one* condition localized to the shoulder, SIRVA is satisfied.  *See* 82 Fed. Reg. 6294, 6296.  While the Response highlights "pain in the neck or back without an injury to the shoulder" plainly does not constitute SIRVA, this statement does *not* indicate a petitioner experiencing pain in the shoulder in addition to pain elsewhere is foreclosed from entitlement because the pain is not limited *only* to the shoulder.  *See id.*  In other words, having pain in the shoulder and another part of the body (even in the arm, for example) can still provide *a* basis for a SIRVA Table claim in addition to perhaps a different off-Table claim, so long as petitioner experienced SIRVA-related pain in the shoulder.  *See id.*  Further, the preamble to the QAIs confirms the simplicity of a SIRVA Table claim:  "SIRVA manifests as shoulder pain and limited range of motion occurring after the administration of a vaccine intended for intramuscular administration in the upper arm," and "is not a neurological injury."

42 C.F.R. § 100.3(c)(10).  This means, if a petitioner received an intramuscular vaccine and experienced "shoulder pain and limited range of motion" (within 48 hours of the vaccination and without any pain prior the vaccine administration), petitioner experienced a SIRVA.  *See id.*

*Grossman*'s "requirement [of] guard[ing] against compensating claims" under QAI 3 where a petitioner experiences pain in addition to, or separate from, a SIRVA, elevates the simple yes/no prerequisite supported by the SIRVA Table preamble and QAIs, and the government's response to the public comment—unduly narrowing access to compensation and complicating the analysis under QAI 3.  Instead of simply noting whether petitioner suffered shoulder pain from the administration of an intramuscular vaccination, *Grossman*'s requirement functionally requires a causation-in-fact analysis to disclaim any concurrent pain external to petitioner's shoulder.  Although the preamble, QAIs, and *Grossman* all allow compensation when a petitioner experiences pain and limited range of motion (notwithstanding any other separate and distinct condition), the Chief Special Master restricted entitlement because petitioner experienced a separate pain generator involving other regions of her left arm in addition to SIRVA in her left shoulder, based on *Grossman*'s misplaced requirement to "guard[] against compensation."  *See* SM Dec. at 12.  Moreover, neither *Valdez*, *Grossman*, nor *Werning* (*i.e.*, the progeny of cases the Chief Special Master referenced in the present action) cited a Federal Circuit case (or even a case from this court) or analyzed the Vaccine Act in support of this requirement of "guard[ing] against compensation" under QAI 3.[19]

By "guard[ing] against compensation," *Grossman* (and the Chief Special Master by relying on it here) improperly interpreted QAI 3 as an *exclusory* criterion and elevated the criterion to require a causation-in-fact analysis.  Considering the QAIs operate as prerequisites (or as a "checklist")—*i.e.*, petitioner need only affirmatively establish evidence for each QAI to receive compensation—the QAIs serve as *eligibility* criteria.  *See de Bazan v. Sec'y of Health & Hum. Servs.*, 539 F.3d 1347, 1351 (Fed. Cir. 2008).  The government admits the QAIs are "not exclusionary criteria." Tr. at 37:10–18.  Petitioner agrees:  "the entire purpose of the Act—and that's stated in *Althen*—whether it's a Table case or a non-Table case, is to allow causation . . . . I don't think [the QAIs are] an exclusionary type of a criteria.  I think it is something that allows for the purpose, which is to proceed with quickness and certainty and it moves this case along." Tr. at 39:9–40:20.  As the Chief Special Master and the government relied on *Grossman* which improperly interpreted QAI 3 as an exclusionary criteria, did not provide any binding authority in support of the interpretation, contravened the Vaccine Act's requirement to provide a "less-adversarial, expeditious, and informal" proceeding, and failed to honor the "pro-claimant" nature of vaccine claims, the Chief Special Master's interpretation and application of a role to "guard[]

---

[19] At oral argument, the government contended this court's opinion in *Record v. United States* (and another case, the "name of [which] escape[d] [government counsel]") supported the proclamation in *Grossman* regarding "guard[ing] against compensation" but conceded "[t]he *Record* case does not use that language."  Tr. at 26:3–11.  The government also noted it "do[es]n't know about the significance of 'guard against,'" *see* Tr. at 38:10–22, and failed to proffer any binding authority certifying QAIs are designed to "guard against compensation."  *See also* Tr. at 41:14–15 ("[PETITIONER]: I think that the purpose of the QAIs are the opposite.").  Further, given the recent addition of SIRVA to the Table, there is little precedent guiding the interpretation of the QAI factors for SIRVA injuries—the government agrees no Federal Circuit precedent exists specifically for SIRVA Table claims.  Tr. at 36:14–21 ("[THE GOVERNMENT]:  Specific to QAI 3, I don't think any have gone to the Federal Circuit.  THE COURT:  Well, there's no Federal Circuit SIRVA Table claims.  [THE GOVERNMENT]: Okay.  THE COURT:  Is that correct?  [THE GOVERNMENT]:  I believe that's right, yes.").

against compensation" under QAI 3 when separate conditions exist is contrary to law.  *See* 42 U.S.C. § 300aa–12(d); *Paluck v. Sec'y of Health & Hum. Servs.*, 786 F.3d 1373, 1380 (Fed. Cir. 2015) ("While review of the factual findings made by a special master is highly deferential, both the Court of Appeals for the Federal Circuit and the Court of Federal Claims have a duty to ensure that the special master has properly applied Vaccine Act evidentiary standards, 'considered the relevant evidence of record, drawn plausible inferences and articulated a rational basis for the decision.'" (cleaned up)); *de Bazan*, 539 F.3d at 1351; *Hines v. Sec'y of Health & Hum. Servs.*, 940 F.2d 1518, 1528 (Fed. Cir. 1991); *J.A.C. v. Sec'y of Health & Hum. Servs.*, No. 25-1751, 2025 WL 3749714, at *1 (Fed. Cir. Dec 29, 2025).

## IX.     Conclusion

For the foregoing reasons, the Court **GRANTS** petitioner's Motion for Review of the Special Master's Decision, ECF No. 55.  The Court **VACATES** the Chief Special Master's Decision finding petitioner did not satisfy QAI 3 and 4 because the Decision was arbitrary, capricious, or otherwise not in accordance with law and **REMANDS** to the Chief Special Master to consider the relevant evidence, draw plausible inferences, and articulate a rational basis for whether, in accordance with this Opinion and Order, petitioner's medical records demonstrate she suffered a SIRVA and satisfied QAIs 3 and 4.  The Chief Special Master **SHALL** issue a new entitlement decision within **90 days** of this decision.  *See* 42 U.S.C. § 300aa-12(e)(2)(C); RCFC App'x B, Rule 28(b).

s/ Ryan T. Holte
RYAN T. HOLTE
Judge